UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

| | |
|---|---|
| MIGUEL SUAREZ, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>ADVANCE AUTO PARTS, INC., THOMAS R. GRECO, JEFFREY W. SHEPHERD, and WILLIAM J. PELLICCIOTTI JR.,<br><br>       Defendants. | No. 5:23-cv-00563-D-BM<br>(Consolidated with No. 5:23-cv-00611-FL)<br><br>15 U.S.C. §§78j(b), 78t(a)<br>17 C.F.R. §240.10b-5<br><br><u>CLASS ACTION</u><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4869-4475-4872.v1

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................5

III.    PARTIES ...............................................................................................................6

IV.     DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF
        BUSINESS.............................................................................................................9

        A.      Defendants Overstated AAP's Financial Results by Improperly
                Accounting for Vendor Incentives..........................................................14

        B.      Defendants' Statements Regarding AAP's Turnaround and FY23 Forecast
                Were False ...............................................................................................19

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS ...........................................................................................27

        A.      Defendants' False and Misleading Financial Statements ......................27

                1.      3Q22 Financial Results..............................................................27

                2.      4Q22 and FY22 Financial Results .............................................29

                3.      1Q23 Financial Results..............................................................32

                4.      2Q23 Financial Results .............................................................33

        B.      Defendants' False and Misleading Statements and Omissions Concerning
                AAP's Turnaround and FY23 Forecast ..................................................35

VI.     AAP'S CLASS PERIOD FINANCIAL RESULTS WERE MISSTATED IN
        VIOLATION OF GAAP.....................................................................................39

        A.      Defendants Have Restated AAP's Class Period Financial Results .......39

        B.      AAP's Restatement Is an Admission of Falsity......................................39

        C.      Defendants' GAAP Violations and Restatement Were Material...........40

        D.      Defendants' GAAP Violations Leading to the Restatement..................40

VII.    LOSS CAUSATION.............................................................................................41

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ...................................................45

4869-4475-4872.v1

A.      Defendants' Fraud Enabled Greco and Shepherd to Receive Excess
        Incentive Compensation Payouts and Lucrative Raises ........................................45

B.      Numerous Executives Resigned or Separated from the Company Under
        Suspicious Circumstances........................................................................................48

C.      The Specific Circumstances of AAP's Restatement Supports Scienter ...............51

D.      The Closeness in Time Between AAP's Full Year Guidance and Its
        Reduction ..................................................................................................................52

E.      The Lack of Internal Controls in AAP's Accounting Department ........................53

IX.     NO SAFE HARBOR ................................................................................................................57

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE .................................................57

XI.     CLASS ACTION ALLEGATIONS ........................................................................................58

COUNT I ...................................................................................................................................................60

COUNT II ..................................................................................................................................................62

PRAYER FOR RELIEF ..........................................................................................................................63

JURY DEMAND .......................................................................................................................................64

4869-4475-4872.v1

## I.   INTRODUCTION

1.      This is a consolidated securities fraud class action brought on behalf of those who purchased Advance Auto Parts, Inc. ("AAP" or the "Company") common stock between November 15, 2022 and November 20, 2023, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.  On February 23, 2024, the Court issued an Order providing for the filing of this Consolidated Complaint.  ECF 50; *see also* ECF 53.

2.      AAP is a retailer specializing in automobile parts and accessories, serving both automobile professionals and non-professional consumers.  During the Class Period, the Company operated stores called "Advance Auto Parts," "Autopart International," "Carquest," and "Worldpac."  AAP operated over 4,700 stores (across all four brands) in the United States and Canada.

3.      Prior to the Class Period, AAP purportedly undertook a broad-based turnaround effort designed to improve the efficiency of its operation and rehabilitate its chronically low margins.  Defendants (as defined herein) represented that these efforts had been successful and that, by the start of the Class Period, "'[a]fter several years of significant investments in complex transformation initiatives,'" despite some setbacks, the Company was primed to "'focus more time and resources on leveraging our differentiated asset base and improving execution to drive long-term shareholder value.'"

4.      On February 28, 2023, supposedly buoyed by "'positive momentum'" from strong results for the fourth quarter of 2022 ("4Q22"), Defendants issued better-than-expected full year 2023 ("FY23") guidance, including $11.4 billion-$11.6 billion in net sales, 1%-3% in comparable

- 1 -

store sales growth, 7.8%-8.2% in operating income margin, and $10.20-$11.20 in diluted earnings per share ("EPS"). The truth, however, was very different from what Defendants led investors to believe.

5.     First, Defendants overstated AAP's 4Q22 and full year 2022 ("FY22") financial results by improperly accounting for vendor incentives. During the Class Period, AAP purchased merchandise from over 1,400 vendors. Its contracts with vendors typically included incentives or credits "in the form of reductions to amounts owed and/or payments from vendors related to volume rebates and other promotional considerations." Correctly accounting for these incentives was critical to the accuracy of AAP's reported financial results and was one of just two "Critical Accounting Policies" with which Defendants represented AAP complied.

6.     In fact, as AAP would later admit, Defendants failed to correctly account for vendor incentives, causing AAP to materially inflate its reporting financial results during the Class Period. For instance, AAP's originally reported operating income and operating margin in 4Q22 were overstated by over 10%. For FY22, AAP understated its costs of sales and selling, general and administrative ("SG&A") expenses by $44 million, which caused reported operating income and operating margin to be overstated by 6.5%. Moreover, Defendants' misstatements were intentional or severely reckless. The inflation in AAP's reported financial results allowed Thomas R. Greco ("Greco") and Jeffrey W. Shepherd ("Shepherd") to secure higher bonus compensation than they would have received had they accurately reported AAP's results. And according to former employee ("FE") 1, who worked in AAP's finance department for a decade, AAP had previously been stockpiling vendor incentives, only to later release them, thereby "masking product margin," a critical metric upon which investors relied. According to FE1, AAP's management was obsessed

4869-4475-4872.v1

with reporting increasing year-over-year financial performance, and everyone in AAP's senior management team must have been aware of this issue.

7. Second, Defendants made false and misleading statements and omissions regarding AAP's turnaround and FY23 forecast. On February 28, 2023, two full months into FY23, Defendants issued AAP's FY23 financial guidance, including projections for revenue, operating income, and operating margin. In the release announcing the guidance, Shepherd emphasized: "'*In 2023 we are elevating our performance* to improve topline growth and share gains while *delivering operating income margin expansion*.'" On the earnings call the same day, Greco stated: "*[W]e're confident that we can continue to grow margins from here*." Indeed, AAP's FY23 guidance called for operating margins of between 7.8% and 8.2%, a significant increase over AAP's reported 6.4% operating margin in FY22. Likewise, the operating margin guidance signaled FY23 operating income between $889 million and $951 million, a significant increase over AAP's reported $714 million of operating income in FY22.

8. Contrary to Defendants' misrepresentations, AAP was in no position to grow margins, and its so-called turnaround efforts had failed to deliver the structural change necessary for AAP to achieve its targets. And when AAP was forced to slash its guidance mere months later, Greco misled investors about the cause of AAP's poor performance, claiming that increased competition in the professional segment had forced AAP to reduce prices, when in fact pricing in the segment was stable, as multiple securities analysts who covered the industry would later confirm. In reality, as Eugene Lee ("Lee"), the Chairman of AAP's Board of Directors (the "Board"), would later admit, AAP was suffering from a "huge structural disadvantage" with respect to its distribution centers, and its assets were simply "not productive enough to create the right margin structure." While Lee's "*[admission] to numerous structural issues in addressing*

4869-4475-4872.v1

*margins*" was viewed positively by analysts, it was too little, too late. Combined with the Company's admissions regarding its inaccurate financial results, as well as a lack of internal controls in its accounting department, these issues made AAP, in Wells Fargo's words, "*uninvestable*."

9. When Defendants could no longer sustain their scheme and wrongful course of business, the true state of affairs at AAP began to be revealed.

10. On May 31, 2023, AAP issued a release entitled "Advance Auto Parts Reports First Quarter 2023 Results." In the release, AAP announced that it was slashing its FY23 guidance, which it had issued just months prior, including by reducing net sales to $11.2 billion-$11.3 billion, operating income margin to 5%-5.3%, and diluted EPS to $6-$6.50. On this news, the price of AAP common stock plummeted by more than 39%, from a close of $112.20 on May 30, 2023 to a close of $68.03 on June 1, 2023.

11. On November 15, 2023, AAP issued a release entitled "Advance Auto Parts Reports Third Quarter 2023 Results and Provides Updates on Strategic and Operational Review." In the release, AAP stated that it was again reducing its FY23 guidance, including by reducing operating income margin to 1.8%-2% and diluted EPS to $1.40-$1.80. The release also included a section entitled "Restatement of Previously Issued Financial Statements," which stated: "In connection with the preparation of the financial statements for the third quarter of 2023, the company identified additional errors impacting cost of sales and selling, general and administrative costs." On this news, the price of AAP common stock declined by almost 5%, from a close of $58.40 on November 14, 2023 to a close of $55.67 on November 15, 2023.

12. On November 17, 2023, AAP filed a Form NT 10-Q with the SEC. In the Form NT 10-Q, AAP stated that it was "unable to complete the filing of its Quarterly Report on

- 4 -

Form 10-Q for the quarter ended October 7, 2023 (the 'Form 10-Q') within the prescribed time frame without unreasonable effort or expense" because it had "identified certain accounting errors impacting cost of sales and selling, general and administrative costs occurring in fiscal year 2022." AAP went on to say that it had "determined that the Company's consolidated financial statements for the affected periods should be revised." On this news, the price of AAP common stock declined by almost 6%, from opening at $54.00 to closing at $50.33 on November 17, 2023.

13. On November 21, 2023, AAP filed its Form 10-Q for the third quarter of 2023 ("3Q23") with the SEC. The Form 10-Q provided additional detail regarding the Company's restatement, including that, in addition to the charge of $17.3 million relating to SG&A expenses incurred but previously expensed, the Company had "identified additional errors impacting cost of sales." The Form 10-Q disclosed: "These errors reduced Cost of sales . . . by $10.2 million and primarily related to product returns and vendor credits." On this news, the price of AAP common stock declined by almost 4%, from a close of $53.02 on November 20, 2023 to a close of $50.99 on November 21, 2023.

14. The declines in the price of AAP's common stock caused hundreds of millions of dollars in losses to AAP investors, who suffered economic harm as the truth about AAP, its operations, and its prospects began to be revealed. This action seeks to recover these losses suffered by Lead Plaintiff City of Southfield General Employees' Retirement System ("Lead Plaintiff" or "Retirement System") and the Class (as defined herein).

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5)

4869-4475-4872.v1

promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  A substantial number of the acts and omissions giving rise to the claims at issue occurred in this District, including the dissemination of materially false and/or misleading information.  AAP's corporate headquarters are located in this District, and Defendants are subject to personal jurisdiction in this District.

17.     In connection with the acts, transactions, and conduct alleged in this Consolidated Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

III.    PARTIES

18.     Lead Plaintiff City of Southfield General Employees' Retirement System is a public pension fund based in Southfield, Michigan with assets over $115 million for the benefit of hundreds of participants.  The Retirement System purchased shares of AAP common stock at artificially inflated prices during the Class Period and was damaged thereby.  On February 9, 2024, the Court issued an Order appointing the Retirement System as Lead Plaintiff.  ECF 48.

19.     Defendant Advance Auto Parts, Inc. is a Delaware corporation with principal executive offices located at 4200 Six Forks Road, Raleigh, North Carolina 27609.  AAP is a retailer specializing in aftermarket automobile parts and accessories, serving both automobile professionals and non-professional consumers.  As of February 24, 2023, AAP had 59,273,781 shares of common stock outstanding.  AAP common stock trades in an efficient market on the NYSE under the ticker symbol "AAP."

4869-4475-4872.v1

20. Defendant Thomas R. Greco served as AAP's President and Chief Executive Officer ("CEO") from April 2016 until September 2023. Greco was also a Company director from April 2016 until September 2023.

21. Defendant Jeffrey W. Shepherd served as AAP's Executive Vice President and Chief Financial Officer ("CFO") from August 2018 until he separated from the Company in August 2023. Shepherd also performed the duties of Chief Accounting Officer ("CAO") from March 2017 through May 2019 and again from April 2021 through the appointment of William J. Pelliccotti Jr. ("Pelliccotti") as CAO in January 2022.

22. Defendant William J. Pelliccotti Jr. served as AAP's Senior Vice President, Controller, and CAO from January 2022 until his resignation became effective in October 2023.

23. Defendants Greco, Shepherd, and Pelliccotti are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with AAP, are referred to herein as "Defendants." Defendants are liable under §§10(b) and 20(a) of the 1934 Act for AAP's false and misleading Class Period statements and omissions.

24. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of AAP, were privy to confidential, proprietary information concerning AAP, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse nonpublic information concerning AAP, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to nonpublic information about AAP's finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, via attendance at management and/or Board meetings and committees thereof, and via reports and other information

- 7 -

4869-4475-4872.v1

provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of AAP's business.

26. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the ability and authority to control the contents of AAP's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

27. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, throughout the Class Period, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to AAP's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of AAP

4869-4475-4872.v1

common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as fraud or deceit on purchasers of AAP common stock. The scheme: (a) deceived the investing public regarding AAP's business, operations, and management and the intrinsic value of AAP common stock; and (b) caused Lead Plaintiff and members of the Class to purchase AAP common stock at artificially inflated prices.

## IV.     DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

29.     AAP is an automotive aftermarket parts provider that serves both professional installers ("DIFM") and do it yourself ("DIY") customers, though 60% of its customer base is professionals, largely auto repair shops that provide post-warranty repairs. During the Class Period, the Company had over 4,700 stores and branches located throughout the United States, Canada, Puerto Rico, and the Virgin Islands, though concentrated primarily in the U.S. northeast, as well as 50 distribution centers operating in 31 U.S. states and Canada that provide products to all of its store locations.

30.     After becoming a publicly traded company in 2001, AAP rapidly expanded, largely through acquisitions, becoming the largest automotive aftermarket parts provider in North America by 2016.

31.     After taking a large stake in the Company during 2015, activist investor Starboard Value LP, displeased with the senior management's performance, advocated for changes, and on January 2, 2016, the then-CEO resigned. On April 4, 2016, AAP announced Frito-Lay North America CEO Greco would become CEO of the Company.

4869-4475-4872.v1

32.     During his seven years at the helm, Greco undertook a broad "turn-around" effort that he claimed was succeeding and significantly improving the Company's business metrics and financial prospects.  On April 20, 2021, AAP hosted a Strategic Investor Update in which the Company laid out a comprehensive three-year strategic business plan.  AAP's three-year strategic business plan focused on "a significant acceleration in margins," "growing sales faster than the market," and returning cash to shareholders.  Greco outlined that the three-year plan "to expand gross margins" would entail "streamlining our supply chain and leveraging our category management initiatives to drive product margin rate," as well as "plans to take cost out of corporate SG&A."

33.     Shepherd provided additional details on the "transformational work to drive product profitability."  He explained that the Company saw "pricing" as a "promising category management initiative" now that the Company had set aside "an antiquated pricing tool that only allowed for a single price at the SKU level."  "Since the implementation of a modern pricing tool," he said, "we now have all the capabilities we would expect in order to be more competitive with our offerings" because "we're now able to plan our approach on a market-by-market basis, and this will be supported by detailed analytics, which enables us to take actions such as promotional pricing that will help to differentiate in any given market and improve margin rate."  In addressing the Company's supply chain, Shepherd highlighted that the Company's "warehouse management system implementation" was set to be completed the following year and that its "cross-banner replenishment initiative," espoused by Executive Vice President Reuben E. Slone ("Slone") to integrate the AAP and Carquest supply chain, was underway.  Additionally, Shepherd noted the Company's "efforts to permanently reduce SG&A costs," which included "going from 4 finance systems to 1, and the establishment of a global capability center in Hyderabad, India," while also

4869-4475-4872.v1

taking a "deep dive into our back office footprint," with the result that the Company "announced last week that we're closing or significantly reducing our Richmond and Roanoke locations." Wrapping up his section at the Strategic Investor Update, Shepherd expressed the Company's "high level of confidence" that these initiatives would "expand our margins . . . due to the fact that nearly all of these efforts are already underway."

34.     Throughout the remainder of 2021 and continuing into 2022, Defendants reassured investors that AAP was successfully executing its three-year strategic business plan.  On a June 2, 2021 earnings call to announce AAP's results for the first quarter of 2021 ("1Q21"), Greco affirmed that "[o]ur entire team . . . remains focused on the execution of our margin expansion initiatives."  Shepherd stated: "We remain committed to delivering against the strategy we laid out in April and are confident in our ability to execute our long-term strategic plans . . . ."

35.     On a November 16, 2021 earnings call to announce AAP's results for the third quarter of 2021 ("3Q21"), Greco reported that the Company "again increased our adjusted operating income margin in the quarter.  Like Q2, this was driven by category management actions within gross margin, where our key initiatives played a role.  First, we are realizing benefits from our new strategic pricing tools and capabilities."  Greco also reported that the Company was "continuing the implementation of our new warehouse management system or WMS.  This is helping to deliver further improvements in fill rate, on-hand accuracy and productivity."  Greco stated: "We are on track to complete the WMS . . . implementation[] by the end of 2023 as discussed in April."  Greco also noted that AAP's "consolidation efforts to integrate Worldpac and Autopart International" were "on track to be completed by early near."  He explained that "[t]his is enabling accelerated growth, gross margin expansion and SG&A savings."  In the "final area of margin expansion," executed through "reducing our corporate and other SG&A costs," Greco

4869-4475-4872.v1

updated investors that the Company "began to realize some of the cost benefits related to the restructuring of our corporate function announced earlier this year."

36.     On a May 24, 2022 earnings call to announce AAP's results for the first quarter of 2022 ("1Q22"), Greco told investors that the Company was "executing our long-term strategic plan," stating that "[w]e remain confident in our long-term plans to expand margins as outlined last year." On an August 24, 2022 earnings call to announce AAP's results for the second quarter of 2022 ("2Q22"), Greco again told investors that the Company was "executing our plan" and that "our long-term goal is to grow above the market and expand margins, and that's what we're executing right now."

37.     On November 16, 2022, despite acknowledging challenges in reaching the targeted margins thresholds AAP laid out to investors in 2021, Greco nonetheless reassured investors that the Company "continue[d] to believe that [it] will achieve the majority of the 3-year goals outlined." He stated: "We're pleased that we were able to deliver a 98-basis point increase in our adjusted gross profit margin rate in Q3. This was primarily driven by our focus on category management, which is our largest initiative to drive profitable growth." He continued: "Strategic pricing initiatives and higher margin rates associated with owned brands were key enablers to adjusted gross profit margin expansion."

38.     By February 2023, Greco was ready for a victory lap. On February 28, 2023, before the opening of trading, Defendants announced AAP's 4Q22 and FY22 financial results for the period ended December 31, 2022, which exceeded Wall Street expectations. For 4Q22, net sales increased 3.2% to $2.5 billion, comparable store sales increased 2.1%, and operating income margin increased 64 basis points.

4869-4475-4872.v1

39.     The release quoted Greco stating, in pertinent part, "'[d]espite challenges throughout 2022, [AAP had] made progress on [its] strategic initiatives, including the expansion of [its] footprint, further strengthening of [its] DieHard® brand and improved customer loyalty,'" though noting, "'we are not satisfied with our results in 2022 and are taking decisive actions to improve performance in 2023.'"  Greco was quick to emphasize, however: "'Importantly, the disciplined inventory and pricing actions we discussed last quarter to adapt to an evolving competitive landscape contributed to stronger results in Q4 and we ended the year with positive momentum.'"

40.     As emphasized by Greco that day, AAP "'expect[ed] to see further improvements in inventory availability throughout 2023,'" which he said "'we view as the single most important driver to accelerate topline growth,'" adding, "'*[a]fter several years of significant investments in complex transformation initiatives and the majority of the integration behind us, we're now able to focus more time and resources on leveraging our differentiated asset base and improving execution to drive long-term shareholder value*.'"

41.     Based on all of this "'positive momentum,'" Defendants provided strong FY23 financial guidance that day, which exceeded analyst expectations, including $11.4 billion-$11.6 billion in net sales, 1%-3% in comparable store sales growth, 7.8%-8.2% in operating income margin, and $10.20-$11.20 in diluted EPS.

42.     Finally, Greco announced that he would be retiring as President and CEO at the end of the year and would subsequently serve in an "advisory capacity through a transition period." Greco stated that he was announcing his retirement at that time because "'we are in the final year of our three-year strategic business plan'" and that, "'by planning for retirement in advance,'" he

4869-4475-4872.v1

would "'be able to work with the Board's Succession Committee to identify [his] successor and facilitate a smooth transition.'"

43. As anticipated, the market responded positively to these statements, with the price of AAP common stock increasing over 3% during the course of the day. In the wake of this positive stock price reaction, AAP undertook an underwritten public debt offering, issuing and selling $300 million of its 5.9% Notes due 2026 and $300 million of its 5.95% Notes due 2028, at 99.938% and 99.919% of par, respectively.

44. Unbeknownst to investors, however, Defendants' statements about AAP's financial performance and prospects were materiality false and misleading because: (i) AAP had inflated its financial results by improperly accounting for vendor incentives; and (ii) AAP's so-called transformation initiatives had not positioned the Company to achieve its stated FY23 financial guidance.

### A. Defendants Overstated AAP's Financial Results by Improperly Accounting for Vendor Incentives

45. During the Class Period, AAP purchased merchandise from over 1,400 vendors. The Company stated that its "purchasing strategy involves negotiating agreements to purchase merchandise over a specified period of time along with other provisions, including pricing, rebates, volume and payment terms." Part of this strategy involved negotiating for incentives. As AAP stated: "We receive incentives in the form of reductions to amounts owed and/or payments from vendors related to volume rebates and other promotional considerations."

46. Correctly accounting for these incentives was critical to the accuracy of AAP's reported financial results. Indeed, during the Class Period, AAP described its accounting for vendor incentives as the **_very first of just two_** "Critical Accounting Policies" and claimed that it reviewed and assessed its accounting for incentives regularly:

- 14 -

Advertising allowances provided as a reimbursement of specific, incremental and identifiable costs incurred to promote a vendor's products are included as an offset to SG&A when the cost is incurred. Volume rebates and vendor promotional allowances that do not meet the requirements for offsetting in SG&A and that are earned based on inventory purchases are initially recorded as a reduction to inventory. These deferred amounts are recorded as a reduction to Cost of sales as the inventory is sold.

Vendor promotional allowances provided as a reimbursement of specific, incremental and identifiable costs incurred to promote a vendor's products are included as an offset to SG&A when the cost is incurred if the fair value of that benefit can be reasonably estimated. Certain of our vendor agreements contain purchase volume incentives that provide for increased funding when graduated purchase volumes are met. Amounts accrued throughout the year could be impacted if actual purchase volumes differ from projected annual purchase volumes. ***Periodic assessments of the accruals are performed to determine the appropriateness of the estimate and are adjusted for accordingly***.

Amounts received or receivable from vendors that are not yet earned are reflected initially as a reduction to inventory, which subsequently is recorded to Cost of sales. Our estimate of the portion of deferred revenue that will be realized within one year of the balance sheet date is included in Other current liabilities. Earned amounts that are receivable from vendors are included in Receivables, net, except for that portion expected to be received after one year, which is included in Other assets, net. ***We regularly review the receivables from vendors to ensure they are able to meet their obligations***. Historically, the change in our reserve for receivables related to vendor funding has not been significant.

47. As Defendants acknowledged in AAP's accounting policy disclosure, AAP was required under Generally Accepted Accounting Principles ("GAAP") to develop reliable accounting estimates for vendor incentives and assess on an ongoing basis whether the underlying assumptions behind the estimates had changed.

48. However, Defendants failed to comply with GAAP, which led to AAP materially overstating its financial results during and prior to the Class Period.

49. The truth regarding AAP's improper accounting was revealed through numerous partial disclosures between May 31, 2023 and March 12, 2024.

4869-4475-4872.v1

50.     First, on May 31, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports First Quarter 2023 Results." The release stated that for the 16 weeks ended April 22, 2023, AAP's SG&A "included an out-of-period charge of approximately $17 million related to costs incurred in prior years but not expensed in the corresponding periods." Defendants failed to provide any additional detail whatsoever about the nature of the costs at that time.

51.     On November 15, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports Third Quarter 2023 Results and Provides Updates on Strategic and Operational Review." In the release, AAP announced: "In connection with the preparation of the financial statements for the third quarter of 2023, the company *identified additional errors impacting cost of sales and selling, general and administrative costs*" and that, as a result, the Company would have to *restate its previously issued financial statements*.[1]

52.     On November 21, 2023, AAP filed its Form 10-Q for the second quarter of 2023 ("2Q23") with the SEC. The Form 10-Q further described and quantified AAP's restatement, stating that, while the Company had previously "identified an out of period charge of $17.3 million, which related to Selling, general and administrative ('SG&A') expenses incurred in prior years but not previously expensed and was corrected by recognizing the charge in the sixteen weeks ended April 22, 2023," new management had now "identified additional errors impacting Cost of sales. These errors reduced Cost of sales in periods prior to fiscal year 2023 by $10.2 million and primarily related to product returns and vendor credits."

---

[1]     In addition, the release disclosed "a change in estimate for inventory reserves that resulted in a one-time impact of approximately $119 million."

53.     Then, in AAP's Form 10-K filed with the SEC on March 12, 2024 ("2023 Form 10-K"), Defendants admitted that the Company's previously issued financial results for full year 2021 ("FY21"), FY22, and the 40 weeks ended October 7, 2023 contained significant accounting errors totaling over $100 million. The accounting errors, which related primarily to AAP incorrectly accounting for vendor incentives, caused AAP to significantly understate its reported expenses and overstate its operating profit during the Class Period.[2]

54.     Defendants' failure to appropriately account for vendor incentives, in turn, allowed AAP to materially understate its reported cost of sales and SG&A expenses and overstate its reported operating income and margins during and prior to the Class Period. For example, AAP's originally reported operating income and operating margin in 4Q22 were overstated by nearly 11%. For FY22, AAP understated its cost of sales and SG&A expenses by $44 million, which caused reported operating income and operating margin to be overstated by 6.5%.

55.     Moreover, AAP has acknowledged that the restatement of the Company's vendor incentives was not the result of a change in estimate based on new information that only became available after the fact. Rather, the restatement, in accordance with the Financial Accounting Standards Board's Accounting Standards Codification Topic 250, *Accounting Changes and Error Corrections* ("ASC 250"), indicates that AAP's reported vendor incentives during the Class Period were not supported by the actual facts and circumstances that existed at the time.

56.     Nor was this the first time Defendants had manipulated AAP's accounting for vendor incentives in order to improve the Company's purported financial performance.

---

[2]     AAP's statements in its SEC filings that its misstatements were not material "on a qualitative and quantitative basis," which was also repeated by certain analysts who followed AAP, were false. ¶¶72, 80(a), 85(a), 89(a), 93(a), 103-104, 140.

4869-4475-4872.v1

57.     FE1 is a former AAP employee who worked in the Company's finance department for almost a decade before leaving in 2021 because of what FE1 believed to be unethical practices by AAP's management.  FE1 has an undergraduate degree in Business Administration, Accounting and Finance, as well as an MBA.  Prior to leaving AAP, FE1 worked in Financial Planning & Analysis and provided support for AAP's merchandising organization, which managed the relationships with AAP's vendors, including negotiating contracts, pricing, and vendor rebates. FE1 reported that an important part of his/her responsibilities related to monitoring margins.  FE1 reported that merchandise sourced by AAP through vendors for resale generally includes a negotiated cost, to which FE1 referred as the "POS cost," as well as negotiated vendor rebates or incentives, usually based on AAP achieving various sales milestones.

58.     FE1 stated that vendor rebates were paid to AAP on a monthly basis and should have been consistently recognized by AAP on a periodic basis as a reduction to the cost of goods sold.  In late 2020, however, FE1 reported that AAP's accounting department became aware that vendor rebate income was simply building up without being timely and properly released. According to FE1, by 2021, when approximately $115 million in deferred rebates had built up, AAP decided to simply release it over a nine-month period, increasing AAP's FY21 net income by more than 10%.

59.     FE1 recalled AAP telling investors that margin expansion in FY21 was due to management expertise and AAP's private label products, when in fact it was the result of releasing deferred vendor rebates.  FE1 also reported that AAP's management was obsessed with reporting increasing year-over-year financial performance, and FE1 believed that everyone in AAP's senior management team had to be aware of the rebate release issue.

4869-4475-4872.v1

60.     FE1 stated that he/she reported their concerns about this issue to their superior, a Senior Vice President, as well as to the SEC.  According to FE1, FE1 saved certain emails before leaving AAP, including an email from an AAP Senior Vice President of Finance admitting that the Company was "masking product margin" through its handling of vendor incentives.

61.     Defendants' failure to appropriately account for vendor incentives artificially inflated the Company's financial results and artificially inflated the Company's stock price, causing damages to members of the Class when AAP's true financial condition was revealed, as set forth herein.

**B.     Defendants' Statements Regarding AAP's Turnaround and FY23 Forecast Were False**

62.     On February 28, 2023, two full months into FY23, Defendants issued AAP's FY23 financial guidance, including projections for revenue, operating income, and operating margin.  In the release announcing the guidance, Shepherd emphasized: "'***In 2023 we are elevating our performance*** to improve topline growth and share gains while ***delivering operating income margin expansion***.'"  On the earnings call the same day, Greco echoed the outlook for margin expansion, stating "***we're confident that we can continue to grow margins from here***.  Right now, we're obviously focused on 2023 and delivering our guidance for the year."  Indeed, AAP's FY23 guidance called for operating margins to be between 7.8% and 8.2%, a significant increase over AAP's 6.4% operating margin in FY22.  Likewise, the operating margin guidance signaled FY23 operating income between $889 million and $951 million, a significant increase over AAP's $714 million of operating income in FY22.  Analysts walked away impressed by the margin guidance.  For example, a Bank of America analyst report noted: "In our view, ***long-term margin improvement remains a key piece of the AAP investment thesis*** and should drive outsized EPS growth versus peers over the next twelve months . . . ."  A J.P. Morgan analyst report commented

- 19 -

that AAP's "2023 op[erating] margin guide [was] better than" expected. Throughout FY23, however, the falsity of Defendants' statements would slowly be revealed as the Company's margins disintegrated and the truth regarding AAP's structural margin deficiencies and prospects was revealed.

63.     On May 31, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports First Quarter 2023 Results." In the release, AAP announced that it was slashing its FY23 guidance, as shown in the chart below. Far from the significant "'***operating income margin expansion***'" Defendants had touted to investors in February, they were now calling for operating income and margins to ***decline*** year-over-year in FY23:

|  | **Original FY23 Guidance (February 28, 2023)** | **Revised FY23 Guidance (May 31, 2023)** | **% Reduced** (Midpoint of Range) |
|---|---|---|---|
| **Operating Income** | $889 million-$951 million | $560 million-$599 million | **37%** |
| **Operating Margin** | 7.8%-8.2% | 5.0%-5.3% | **36%** |

64.     Moreover, Defendants' explanation for AAP's poor performance and guidance reduction was false. During the May 31, 2023 conference call with investors to discuss AAP's first quarter of 2023 ("1Q23") results, Greco and Shepherd, sought to blame AAP's poor performance on "external" factors, including increased competition in the DIFM segment, with Greco stating: (a) "the dynamic has changed on the pro side"; (b) "[i]n order to sustain our targeted competitive price position in Q1, we had less price realization than plan[ned], which put substantially higher pressure on our product margin rate"; and (c) "sustaining our competitive price targets by category will require higher than planned price investments in pro, and we factored this into our full year guide."

4869-4475-4872.v1

65.     These and other remarks caused Morgan Stanley analyst Simeon Ari Gutman ("Gutman") to have the following exchange with Greco during the call, in which Gutman pointed out that competitors had not reported seeing the "competitive" price dynamics on which AAP had remarked.  Focusing his response on how AAP established its price targets, Greco sidestepped Gutman's inquiry about AAP's competitors not having noted the same "very competitive price-driven backdrop" as AAP:

> [Gutman:] In the prepared remarks, it somewhat painted a picture of like a very competitive price-driven backdrop.  Curious if you can discuss – it has, especially commercial resorted to, I don't want to say any price war, but it sounds a little different than the way the other competitors described it.  Are you seeing price matching?  Is it coming from the big chains?  Is it coming from the independents?  Can you discuss that competitiveness a little more, please?

> [Greco:] Simeon, I think it's consistent with what I said earlier.  I mean, we were establishing our price targets based on what we see every week in the industry in each category, and we react to that.  I mean, we've got a very strong team in strategic pricing.  They look at our unit lift in each of the categories in terms of how we would perform at different levels, and we've got a very clear idea of where we need to be in order to deliver unit improvement and secure more jobs.

> So they established those targets for each category, and when we see that move, and again, that's at an industry level.  We don't measure – we look at individual competitors that are close in, but it's really more at the industry level that we drive our pricing strategy off of, so I think it's a combination of the two.

66.     However, analysts who covered the automotive industry, and were concerned whether AAP's poor performance portended broader weakness in the industry, contradicted Greco's explanations.  Wells Fargo, in a June 2, 2023 analyst report entitled "AAP: Internal Control Issue the Next Shoe to Drop; Lowering PT Again," wrote: "***AAP Q1 price commentary is out of line w/ peers, suggesting price is still rational w/ DIFM customers willing to pay a premium for speed/fulfillment***."  Stephens, in a June 1, 2023 analyst report entitled "AAP Misses 1Q23; Guidance Cut Still Implies 2H Improvement; Remain EW," stated: "***AAP's commentary suggests that DIFM pricing actions were needed to stem share losses, and this is surprising as***

4869-4475-4872.v1

*other large players have noted pricing is 'disciplined' and as recently as last week discussed the low price-elasticity seen in the market*."

67.     Indeed, analysts who covered AAP were shocked by the Company's disclosures, and openly questioned management's credibility and prior financial reporting.  J.P. Morgan, in a June 1, 2023 analyst report entitled "Uncertainty Too High; Continue to See Better Options in AZP/ORLY; Downgrading to Neutral," wrote: (a) AAP's 1Q23 results were "[m]uch worse than our well-below the Street forecast"; (b) "*AAP's continued underperformance and slashing of its long-term forecast rais[ed] credibility concerns*"; and (c) "1Q's results and guidance cut (after providing its outlook mid-quarter on Feb 28) *suggests management over-earned last year as it sought to control the 'controllables*' and deliver what their investor targets emphasized (i.e., price and structural margins, respectively)."  Wells Fargo, in its June 2, 2023 analyst report also wrote the "hits keep coming for AAP after disclosing a potentially material internal control weakness and 10Q filing delay.  Needless to say, *the wheels appear to be coming off* post-very weak Q1 results."

68.     The worst was not yet over.  On August 23, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports Second Quarter 2023 Results."   In the release, AAP announced disappointing 2Q23 financial results caused primarily by the Company's continued inability to raise prices in the DIFM segment and that AAP was *again* slashing its FY23 guidance, as shown in the chart below.  The release also stated that AAP was initiating a new "comprehensive operational and strategic review" to address its poor performance.

|  | Original FY23 Guidance (February 28, 2023) | Revised FY23 Guidance (August 23, 2023) | % Reduced (Midpoint of Range) |
|---|---|---|---|
| **Operating Income** | $889 million-$951 million | $450 million-$488 million | **49%** |
| **Operating Margin** | 7.8%-8.2% | 4.0%-4.3% | **48%** |

69.     Later that day, AAP, Greco, Lee, and Anthony Iskander ("Iskander") hosted a conference call with investors to discuss AAP's 2Q23 results.  During the call, Lee admitted that AAP's poor performance and margin failures were being caused not by external competitive pressure, as Greco had previously represented, but rather by structural failures within AAP, which the Company's supposed turnaround had failed to remediate:

[D.A. Davidson Analyst:] Okay.  Gene, if I could just follow-up on that last point.  Can you remind what do you see as the structural differences between your margin structure and the other guys?  We know there's different rent versus own situation, which maybe drags down your margins a little bit versus competitors.  But even if you look at it on like an EBITDAR basis, there's a huge gap, and that gap has widened over time.  So what are the structural differences besides you guys rent more stores than they do?

[Lee:]  Well, I think it's the mix of the business.  Remember, we've got a very large business inside our business, which is the independents in which the margin structure is very, very different, but it's a very lucrative business.  *I would say the biggest thing that impacts our margins overall is the asset productivity, right?*  We're doing approximately 1.7 a box, and the other guys are doing approximately 2.3, 2.4.  So, I mean, if you just look at that productivity, you just increase it just the $2 million, what it does to our margins.

The flow-through on that additional sales is fantastic.  *And also, when you look at the way our distribution centers are set up, that's a huge structural disadvantage that will need to be addressed at some point*.  *How that gets prioritized, I don't know today, but that needs to be dealt with*.  And so I keep reverting back to – and I describe it as asset productivity.  *Our assets are not productive enough to create the right margin structure*.  Then you get into own versus rent, channel mix, our independent business.  But the first priority is to improve the productivity of all the assets.  That will impact the biggest impact on margins.

4869-4475-4872.v1

70.     Analysts were surprised by Lee's admissions.  BNP Paribas, in an August 23, 2023 analyst report entitled "Still see more risk ahead," stated: "Positively, ***for the first time in memory, AAP admitted to numerous structural issues in addressing margins*** and pivoted the investment story to a productivity story."  D.A. Davidson, in an August 23, 2023 analyst report entitled "Some Positives, But Also Some Negatives," wrote:

> *2Q23 EPS missed consensus by 14% due to another big gross margin miss, and the company once again slashed their full year guidance by 23% at the midpoint (it was cut 42% last quarter), primarily on lower margins.  The implied back half guidance is now 30% below consensus.*
>
> *. . . [T]he long awaited and elusive 'close the margin gap' story once **again is pushed out** as AAP is now expected to end this year with margins of 4.2% at the midpoint versus our estimates of 19.5% and 20.3% for AZO and ORLY.*

71.     On November 15, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports Third Quarter 2023 Results and Provides Updates on Strategic and Operational Review."  In the release, AAP announced ***again*** disappointing results and that, less than nine months after Defendants had first issued AAP's FY23 financial guidance, which called for significant "'***operating income margin expansion***,'" the Company again significantly cut its guidance as depicted in the chart below.  The Company also announced: "In connection with the preparation of the financial statements for the third quarter of 2023, the company identified additional errors impacting cost of sales and selling, general and administrative costs" and that it would have to restate its previously issued financial results.  In addition, AAP announced "a change in estimate for inventory reserves that resulted in a one-time impact of approximately $119 million."

4869-4475-4872.v1

| | Original FY23 Guidance (February 28, 2023) | Revised FY23 Guidance (November 15, 2023) | % Reduced (Midpoint of Range) |
|---|---|---|---|
| **Operating Income** | $889 million-$951 million | $202 million-$226 million | **77%** |
| **Operating Margin** | 7.8%-8.2% | 1.8%-2.0% | **76%** |

72.     Once again, analysts were taken aback by AAP's results, which were utterly inconsistent with Defendants' prior representations, and again questioned AAP's prior financial reporting.  BNP Paribas, in a November 15, 2023 analyst report entitled "Even at current levels, we're still concerned," noted: "While it's possible there were some kitchen sink items in gross margins . . . [w]e surmise ***the accounting charge that it took likely had some level of periodic over-earning in prior years associated with it*** as well . . . ."  Truist, in a November 15, 2023 analyst report entitled "We would be cautious on banking on strategic change; core is under severe pressure," wrote: "Advance is a complex business that is under significant financial strain . . . , is experiencing sharply deteriorating profitability/cash flow and is now uncovering financial misstatements."  The Truist report went on to state:

> **Financial misstatements should not be ignored; the mosaic isn't pretty**
> – The company made a number of restatements today to their 2022 financials. While they don't appear to be material in aggregate and some of them were misplacements in the P&L and BS geography, it's hard to ignore that these restatements have occurred after an extremely short stint from the new finance team.  During today's call, they commented that they are trying to fix the material weakness in their reporting, are continuing to dig for more information and conceded that they could uncover more.  ***For a company that has had a rotating cast of executives, including several CFOs over the past decade, another CFO that was dismissed last quarter and a C-suite team that has been under intense pressure to improve their performance over the last several years, we suspect we haven't seen the last restatements from Advance***.

4869-4475-4872.v1

73. Wells Fargo, in a November 15, 2023 analyst report entitled "AAP; More Moving Parts than an Automatic Transmission; Q3 Further Muddies the Water," pulled no punches: "*Absent more evidence/clarity, AAP looks uninvestable*."

74. Moreover, Defendants' concealment of the significant accounting errors further masked the false and misleading nature of AAP's FY23 financial guidance. AAP's 4Q22 and FY22 financial results served as the basis for better-than-expected FY23 guidance. Indeed, Greco emphasized to investors: "[T]he decisive actions we took in the latter half of the year led to improved performance in Q4, and we expect that to continue into 2023." Analysts took notice. For example, a J.P. Morgan analyst report noted: "4Q Beat with [FY] 2023 Better than Feared. . . . Overall, AAP reported strong results . . . ." Likewise, an RBC Capital Markets analyst report confirmed: "Better Than Expected 4Q Results." However, unbeknownst to analysts and investors, AAP's surprisingly strong 4Q22 results were significantly inflated, as the Company later admitted. These accounting errors allowed AAP to understate its cost of sales and SG&A expenses by millions of dollars, which resulted in AAP significantly overstating its reported 4Q22 operating income and operating margin by 10.6%. For FY22, AAP understated its cost of sales and SG&A expenses by $44 million, which caused its reported operating income and operating margin to be overstated by 6.5%. The actual, significantly lower, FY22 and 4Q22 financial results would have immediately called into question the viability of AAP's FY23 guidance. Instead, AAP's inflated FY22 results, and 4Q22 results in particular, allowed Defendants to deliver upbeat FY23 guidance that led investors to believe AAP would soon deliver significant "*operating income margin expansion*" when Defendants did not believe, and had no reasonable basis to believe, such margin expansion would be achieved.

4869-4475-4872.v1

75.     Ultimately, in February 2024, AAP reported its results for the fourth quarter of 2023 ("4Q23") and FY23, which incorporated the impact of the restatement to correct Defendants' significant accounting errors.  The FY23 results were a mere fraction of the results Defendants had touted to investors just 12 months earlier:

| | **Original FY23 Guidance** (February 28, 2023) | **Actual FY23 Results** (February 28, 2024) | **% Difference** (Midpoint of Range) |
|---|---|---|---|
| **Operating Income** | $889 million-$951 million | $114 million | **88%** |
| **Operating Margin** | 7.8%-8.2% | 1.0% | **88%** |

76.     Moreover, contradicting Defendants' prior suggestion that external market dynamics were to blame for AAP's disastrous performance, none of the Company's competitors saw the disastrous performance AAP did in 2023.  On February 8, 2023, O'Reilly Automotive announced its FY23 operating margin guidance at 19.8%-20.3% and ultimately exceeded the midpoint of its range, achieving a 20.2% operating margin for FY23.  AutoZone, which does not provide guidance and whose FY23 ended on August 26, 2023, achieved a 19.9% operating margin.

77.     Defendants' misstatements regarding AAP's turnaround and FY23 guidance artificially inflated the Company's stock price, causing damages to members of the Class when AAP's true financial condition was revealed as set forth herein.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     Defendants' False and Misleading Financial Statements

#### 1.     3Q22 Financial Results

78.     On November 15, 2022, AAP issued a press release setting forth AAP's financial results for the third quarter of 2022 ("3Q22") and the 40 weeks ended October 8, 2022.  The release

4869-4475-4872.v1

included quotes from, and was approved by, Greco and Shepherd. For the 40 weeks ended October 8, 2022, the release reported operating income margin of 6.7% and operating income of $582.1 million.

79.     On November 16, 2022, AAP filed a Form 10-Q with the SEC reporting the same financial results set forth in AAP's November 15, 2022 release. The Form 10-Q stated: "Our financial statements have been prepared in accordance with GAAP." The Form 10-Q was signed by Pellicciotti. The Form 10-Q was also certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Greco and Shepherd, each of whom certified that the financial information contained in the 3Q22 Form 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting:

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:
>
> *      *      *
>
> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> *      *      *
>
> (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely

- 28 -

affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

80. The statements set forth in ¶¶78-79 were materially false and misleading when made. The true facts were that:

(a) Because Defendants had improperly accounted for vendor incentives, AAP's financial results included in its 3Q22 earnings release and 3Q22 Form 10-Q were materially overstated. Specifically, for the 40 weeks ended October 8, 2022, AAP's operating income and operating margin were overstated by 5.7% as shown in the chart below:

**40 weeks ended October 8, 2022**

|  | As Originally Reported | As Restated | % Overstated |
|---|---|---|---|
| Operating Income | $ 582,149 | $ 550,944 | 5.7% |
| Operating Margin | 6.7% | 6.3% | 5.7% |
| Net Income | $ 395,176 | $ 381,498 | 3.6% |
| Earnings Per Share | $ 6.47 | $ 6.26 | 3.4% |

(b) AAP's 3Q22 financial results were not prepared in compliance with GAAP, the Company's internal control over financial reporting was not effective as of 3Q22, and AAP's financial statements did not present fairly in all material respects AAP's financial condition and results of operations.

### 2. 4Q22 and FY22 Financial Results

81. On February 28, 2023, AAP issued a release setting forth AAP's financial results for 4Q22 and FY22. The release included quotes from, and was approved by, Greco and Shepherd. The release reported that AAP's "GAAP [o]perating income for 4Q22 was $132.0 million, an increase of 17.4% compared with the fourth quarter of the prior year," while, for FY22, AAP's

"GAAP [o]perating income was $714.2 million." Defendants also reported that for the 12 weeks and 52 weeks ended December 31, 2022, AAP's net income was $106.7 million and $501.9 million, respectively, while EPS was $1.79 and $8.27, respectively.

82. Also on February 28, 2023, AAP filed a Form 10-K with the SEC ("2022 Form 10-K") reporting the same financial results set forth in AAP's February 28, 2023 release. The 2022 Form 10-K stated: "Our financial statements have been prepared in accordance with GAAP." The 2022 Form 10-K was signed by Greco, Shepherd, and Pellicciotti, among others. Similar to the 3Q22 Form 10-Q, the 2022 Form 10-K was also certified pursuant to SOX by Greco and Shepherd.

83. The 2022 Form 10-K included a discussion of AAP's treatment of vendor incentives, stating it was one of AAP's "Critical Accounting Policies":

> Vendor promotional allowances provided as a reimbursement of specific, incremental and identifiable costs incurred to promote a vendor's products are included as an offset to SG&A when the cost is incurred if the fair value of that benefit can be reasonably estimated. Certain of our vendor agreements contain purchase volume incentives that provide for increased funding when graduated purchase volumes are met. Amounts accrued throughout the year could be impacted if actual purchase volumes differ from projected annual purchase volumes. *Periodic assessments of the accruals are performed to determine the appropriateness of the estimate and are adjusted for accordingly*.

> Amounts received or receivable from vendors that are not yet earned are reflected initially as a reduction to inventory, which subsequently is recorded to Cost of sales. Our estimate of the portion of deferred revenue that will be realized within one year of the balance sheet date is included in Other current liabilities. Earned amounts that are receivable from vendors are included in Receivables, net, except for that portion expected to be received after one year, which is included in Other assets, net. *We regularly review the receivables from vendors to ensure they are able to meet their obligations*. Historically, the change in our reserve for receivables related to vendor funding has not been significant.

4869-4475-4872.v1

84.    Also on February 28, 2023, AAP, Greco, and Shepherd held a conference call with investors to discuss AAP's 4Q22 and FY22 results.  During the conference call, Shepherd repeated the same financial results set forth in AAP's February 28, 2023 release.

85.    The statements set forth in ¶¶81-84 were materially false and misleading when made.  The true facts were that:

(a)    Because Defendants had improperly accounted for vendor incentives, AAP's 4Q22 and FY22 financial results were materially overstated.  Specifically, as shown in the charts below, AAP's operating income for the 12 weeks and 52 weeks ended December 31, 2022 was overstated by 10.6% and 6.5%, respectively.  AAP's operating margin for the same time periods was overstated by 10.6% and 6.5%, respectively.  AAP's net income for the same time periods was overstated by 28.7% and 8.1%, respectively.  And AAP's EPS for the same time periods was overstated by 28.8% and 8.1%, respectively.

**12 weeks ended December 31, 2022**

|  | As Originally Reported | As Restated | % Overstated |
|---|---|---|---|
| Operating Income | $               132,002 | $               119,309 | 10.6% |
| Operating Margin | 5.3% | 4.8% | 10.6% |
| Net Income | $               106,697 | $               82,904 | 28.7% |
| Earnings Per Share | $                   1.79 | $                   1.39 | 28.8% |

**52 weeks ended December 31, 2022**

|  | As Originally Reported | As Restated | % Overstated |
|---|---|---|---|
| Operating Income | $               714,151 | $               670,253 | 6.5% |
| Operating Margin | 6.4% | 6.0% | 6.5% |
| Net Income | $               501,872 | $               464,402 | 8.1% |
| Earnings Per Share | $                   8.27 | $                   7.65 | 8.1% |

(b)    AAP's 4Q22 and FY22 financial results were not prepared in compliance with GAAP, the Company's internal control over financial reporting was not effective as of 4Q22,

4869-4475-4872.v1

and AAP's financial statements did not present fairly in all material respects AAP's financial condition and results of operations.

(c)     AAP had failed to comply with its own admittedly critical accounting policies as it failed to periodically assess its accruals and failed to regularly review its receivables from vendors to ensure that vendor incentives were correctly accounted for.

### 3.     1Q23 Financial Results

86.     On May 31, 2023, AAP issued a release setting forth AAP's financial results for 1Q23.  The release included quotes from, and was approved by, Greco and Shepherd.  The release reported that for 1Q23 the Company's operating income was $90.0 million, its net income was $42.7 million, and its EPS was $0.72.[3]

87.     Also on May 31, 2023, AAP, Greco, and Shepherd held a conference call with investors to discuss AAP's 1Q23 results.  During the conference call, Shepherd repeated the same financial results set forth in AAP's May 31, 2023 release.

88.     On June 6, 2023, AAP filed a Form 10-Q with the SEC reporting the same financial results set forth in AAP's May 31, 2023 release.  The Form 10-Q stated: "Our financial statements have been prepared in accordance with GAAP."  The Form 10-Q was signed by Pellicciotti.  The Form 10-Q was also certified pursuant to SOX by Greco and Shepherd, each of whom certified that the financial information contained in the 1Q23 Form 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting.

---

[3]     During 1Q23, the Company discovered a $17 million accounting error that dated back to a prior period.  AAP corrected the error in 1Q23 rather than restate the prior period.  Thus, its actual 1Q23 results, when adjusted for the out-of-period error, included operating income of $106.7 million and operating margin of 3.1%.

4869-4475-4872.v1

89. The statements set forth in ¶¶86-88 were materially false and misleading when made. The true facts were that:

(a) Because Defendants had improperly accounted for vendor incentives, AAP's 1Q23 financial results were materially overstated. Specifically, AAP's 1Q23 operating income and operating margin, adjusted for the prior-period accounting error, were overstated by 8.9% as shown in the chart below:

**16 weeks ended April 22, 2023**

|  | As Originally Reported (adjusted for prior error correction) | As Restated | % Overstated |
|---|---|---|---|
| Operating Income | $ 106,673 | $ 97,938 | 8.9% |
| Operating Margin | 3.1% | 2.9% | 8.9% |

(b) AAP's 1Q23 financial results were not prepared in compliance with GAAP, the Company's internal control over financial reporting was not effective as of 1Q23, and AAP's financial statements did not present fairly in all material respects AAP's financial condition and results of operations.

### 4. 2Q23 Financial Results

90. On August 23, 2023, AAP issued a release setting forth AAP's financial results for 2Q23. The release included quotes from, and was approved by, Greco. The release reported that for 2Q23, AAP's operating income was $134.4 million, its operating margin was 5.0%, its net income was $85.4 million, and its EPS was $1.43.

91. Also on August 23, 2023, AAP, Greco, Lee, and Iskander held a conference call with investors to discuss AAP's 2Q23 results. During the conference call, Iskander repeated the same financial results set forth in AAP's August 23, 2023 release.

4869-4475-4872.v1

92.     Also on August 23, 2023, AAP filed a Form 10-Q with the SEC reporting the same financial results set forth in AAP's August 23, 2023 release.  The Form 10-Q stated: "Our financial statements have been prepared in accordance with GAAP."  The Form 10-Q was signed by Pellicciotti.  The Form 10-Q was also certified pursuant to SOX, including by Greco, who certified that the financial information contained in the 2Q23 Form 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting.

93.     The statements set forth in ¶¶90-92 were materially false and misleading when made.  The true facts were that:

(a)     Because Defendants had improperly accounted for vendor incentives, AAP's 2Q23 financial results were materially overstated.  Specifically, AAP's 2Q23 operating income and operating margin were overstated by 6.7%, its net income was overstated by 8.6%, and its EPS was overstated by 8.3%, as shown in the chart below:

**12 weeks ended July 15, 2023**

|  | As Originally Reported | As Restated | % Overstated |
|---|---|---|---|
| Operating Income | $                 134,368 | $                 125,960 | 6.7% |
| Operating Margin | 5.0% | 4.7% | 6.7% |
| Net Income | $                   85,362 | $                   78,577 | 8.6% |
| Earnings Per Share | $                      1.43 | $                      1.32 | 8.3% |

(b)     AAP's 2Q23 financial results were not prepared in compliance with GAAP, the Company's internal control over financial reporting was not effective as of 2Q23, and AAP's financial statements did not present fairly in all material respects AAP's financial condition and results of operations.

4869-4475-4872.v1

**B.**    **Defendants' False and Misleading Statements and Omissions Concerning AAP's Turnaround and FY23 Forecast**

94.    On February 28, 2023, AAP issued a release entitled "Advance Auto Parts Reports Fourth Quarter and Full Year 2022 Results."   The release included AAP's FY23 financial guidance, including projections for revenue, operating income, and operating margin.   In the release announcing the guidance, Greco stated: "'After several years of significant investments in complex transformation initiatives and the majority of the integration behind us, we're now able to focus more time and resources on leveraging our differentiated asset base and improving execution to drive long-term shareholder value.'"   Shepherd stated: "'***In 2023 we are elevating our performance*** to improve topline growth and share gains while ***delivering operating income margin expansion***'" and provided the following FY23 guidance:

| ($ in millions, except per share data) | 2023 | | |
|---|---|---|---|
| | Low | | High |
| Net sales | $   11,400 | $ | 11,600 |
| Comparable store sales [(1)] | 1.0 % | | 3.0 % |
| Operating income margin | 7.8 % | | 8.2 % |
| Income tax rate | 24.0 % | | 25.0 % |
| Diluted EPS | $   10.20 | $ | 11.20 |
| Capital expenditures | $   300 | $ | 350 |
| Free cash flow [(2)] | Minimum $400 | | |
| New store and branch openings | 60 | | 80 |

95.    Later that day, AAP, Greco, and Shepherd hosted a conference call with investors to discuss the Company's 4Q22 results and FY23 guidance.   On the earnings call, Greco stated:

> [A]fter several years of significant investments in complex transformation initiatives and with the majority of the integration behind us, we're now able to focus more time and resources on improving execution.
>
> *          *          *
>
> As you know, we've gone through a complex transformation spending several years of significant investment.   With the majority of this effort behind us, we're now able to focus more resources on driving execution and operating performance . . . .

- 35 -

<center>*      *      *</center>

[W]e're confident that we can continue to grow margins from here.

Shepherd also stated AAP was "laser focused on both growing our gross margin while controlling our cost base" and reiterated the FY23 guidance numbers set forth in the release earlier that day.

96.     The statements set forth in ¶¶94-95 were materially false and misleading when made.  The true facts were that:

(a)     AAP's so-called transformation had not been successful, had not positioned the Company to grow its margins in FY23, and did not enable the Company to close the significant margin gap with its competitors.  ¶¶62-77.

(b)     AAP had "over-earned" in FY22, setting itself up for margin contraction, not growth, in FY23.  As J.P. Morgan wrote in its June 1, 2023 analyst report, the fact that AAP cut its guidance in May, "after providing its outlook mid-quarter on Feb 28[,] *suggests management over-earned last year*."  ¶67.

(c)     As Lee would later admit, AAP's assets were simply "not productive enough to create the right margin structure" to allow AAP to compete effectively, and the way AAP had set up its distribution centers created "a huge structural disadvantage" that AAP had failed to address.  ¶¶69-70.

(d)     AAP's FY23 guidance was based in part on inflated financial results and performance, which failed to properly account for vendor incentives and which, once corrected, made the Company's FY23 guidance still further unattainable.  ¶¶45-76.

(e)     AAP's actual FY23 financial results were so far below the Company's FY23 guidance as to further demonstrate the falsity of the Company's misstatements and

<center>- 36 -</center>

omissions, including operating income and margin **88% lower** than that in which AAP, Greco, and Shepherd had expressed confidence in February 2023.  ¶¶62-75.

97.     On May 31, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports First Quarter 2023 Results."  In the release, AAP, Greco, and Shepherd announced that AAP was slashing its FY23 guidance.  Far from the significant "'***operating income margin expansion***'" Defendants had touted to investors in February, AAP was now calling for operating income and margins to ***decline*** year-over-year in FY23.  ¶¶62-63.

98.     During AAP's May 31, 2023 1Q23 conference call with investors, Greco and Shepherd sought to blame AAP's poor performance on "external" factors, including increased competition in the DIFM segment, with Greco stating: (a) "the dynamic has changed on the pro side"; (b) "[i]n order to sustain our targeted competitive price position in Q1, we had less price realization than plans, which put substantially higher pressure on our product margin rate"; and (c) "sustaining our competitive price targets by category will require higher than planned price investments in pro, and we factored this into our full year guide."

99.     These and other remarks caused Morgan Stanley analyst Gutman to ask if there was an "I don't want to say any price war," in the industry and Greco to confirm his earlier comments:

> [Gutman:] In the prepared remarks, it somewhat painted a picture of like a very competitive price-driven backdrop.  Curious if you can discuss – it has, especially commercial resorted to, I don't want to say any price war, but it sounds a little different than the way the other competitors described it.  Are you seeing price matching?  Is it coming from the big chains?  Is it coming from the independents?  Can you discuss that competitiveness a little more, please?

> [Greco:] Simeon, I think it's consistent with what I said earlier.  I mean, we were establishing our price targets based on what we see every week in the industry in each category, and we react to that.  I mean, we've got a very strong team in strategic pricing.  They look at our unit lift in each of the categories in terms of how we would perform at different levels, and we've got a very clear idea of where we need to be in order to deliver unit improvement and secure more jobs.

4869-4475-4872.v1

So they established those targets for each category, and when we see that move, and again, that's at an industry level. We don't measure – we look at individual competitors that are close in, but it's really more at the industry level that we drive our pricing strategy off of, so I think it's a combination of the two.

100. The statements set forth in ¶¶98-99 were materially false and misleading when made. The true facts were that:

(a) Increased price competition was not responsible for AAP's poor performance. Wells Fargo, in a June 2, 2023 analyst report entitled "AAP: Internal Control Issue the Next Shoe to Drop; Lowering PT Again," wrote: "***AAP Q1 price commentary is out of line w/ peers, suggesting price is still rational w/ DIFM customers willing to pay a premium for speed/fulfillment***." Stephens, in a June 1, 2023 analyst report entitled "AAP Misses 1Q23; Guidance Cut Still Implies 2H Improvement; Remain EW," stated: "AAP's commentary suggests that DIFM pricing actions were needed to stem share losses, ***and this is surprising as other large players have noted pricing is 'disciplined'*** and as recently as last week discussed the low price-elasticity seen in the market."

(b) AAP had "over-earned" in FY22, setting itself up for margin contraction, not growth, in FY23. As J.P. Morgan wrote in its June 1, 2023 analyst report: "AAP's continued underperformance and slashing of its long-term forecast rais[ed] credibility concerns" and "1Q's results and guidance cut (after providing its outlook mid-quarter on Feb 28) suggests management over-earned last year." ¶67.

(c) As Lee would later admit, AAP's assets were simply "not productive enough to create the right margin structure" to allow AAP to compete effectively, and the way AAP had set up its distribution centers created "a huge structural disadvantage" that AAP had failed to address. ¶¶69-70.

4869-4475-4872.v1

## VI. AAP'S CLASS PERIOD FINANCIAL RESULTS WERE MISSTATED IN VIOLATION OF GAAP

### A. Defendants Have Restated AAP's Class Period Financial Results

101. In AAP's 2023 Form 10-K, filed with the SEC on March 12, 2024, Defendants disclosed that AAP's previously issued financial results for FY21, FY22, and the 40 weeks ended October 7, 2023 contained significant accounting errors totaling over $100 million. The accounting errors, which related primarily to AAP incorrectly accounting for vendor incentives, caused AAP to significantly understate its reported expenses and overstate its operating profit during the Class Period. Defendants further disclosed that to correct the accounting errors, AAP was restating its financial results for the affected periods in accordance with ASC 250.

### B. AAP's Restatement Is an Admission of Falsity

102. The fact that AAP has restated its prior financial results is an admission that its Class Period financial statements were false and not prepared in accordance with GAAP. In accordance with ASC 250, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, there is a change in reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. The type of restatement and revisions announced by AAP were to correct accounting errors, which were in violation of GAAP, in its previously issued financial statements. Under ASC 250-10-20, this type of restatement only applies to "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." Thus, the restatement is an admission by Defendants that AAP's Class Period financial results were false and in violation of GAAP.

4869-4475-4872.v1

**C. Defendants' GAAP Violations and Restatement Were Material**

103.    AAP's restatement is an admission that the accounting errors were material. Under ASC 250, GAAP provides that financial statements need not be restated to correct immaterial errors. As part of the restatement, Defendants acknowledged that the impact of the errors, in aggregate, were material to AAP's FY22 financial statements.

104.    Further demonstrating the materiality of the restatement, while AAP's (falsely) reported 4Q22 results beat analysts' consensus forecast for adjusted operating margin, had Defendants accurately reported AAP's 4Q22 results, the Company would have missed analyst consensus forecast for adjusted operating margin by a sizable amount.

**D. Defendants' GAAP Violations Leading to the Restatement**

105.    AAP's restatement was required to correct significant accounting errors that stemmed primarily from AAP's improper accounting for vendor credits in its Class Period financial statements. During the Class Period, AAP described its accounting for vendor incentives as one of the "Critical Accounting Policies" and disclosed the following to investors in its SEC filings:

> We receive incentives in the form of reductions to amounts owed and/or payments from vendors related to volume rebates and other promotional considerations. Many of these incentives are under agreements with terms in excess of one year, while others are negotiated on an annual basis or less. Advertising allowances provided as a reimbursement of specific, incremental and identifiable costs incurred to promote a vendor's products are included as an offset to SG&A when the cost is incurred. Volume rebates and vendor promotional allowances that do not meet the requirements for offsetting in SG&A and that are earned based on inventory purchases are initially recorded as a reduction to inventory. These deferred amounts are recorded as a reduction to Cost of sales as the inventory is sold.
>
> Vendor promotional allowances provided as a reimbursement of specific, incremental and identifiable costs incurred to promote a vendor's products are included as an offset to SG&A when the cost is incurred if the fair value of that benefit can be reasonably estimated. Certain of our vendor agreements contain

- 40 -

purchase volume incentives that provide for increased funding when graduated purchase volumes are met. Amounts accrued throughout the year could be impacted if actual purchase volumes differ from projected annual purchase volumes. Periodic assessments of the accruals are performed to determine the appropriateness of the estimate and are adjusted for accordingly.

Amounts received or receivable from vendors that are not yet earned are reflected initially as a reduction to inventory, which subsequently is recorded to Cost as sales. Our estimate of the portion of deferred revenue that will be realized within one year of the balance sheet date is included in Other current liabilities. Earned amounts that are receivable from vendors are included in Receivables, net, except for that portion expected to be received after one year, which is included in Other assets, net. We regularly review the receivables from vendors to ensure they are able to meet their obligations. Historically, the change in our reserve for receivables related to vendor funding has not been significant.

106.    As Defendants acknowledged in AAP's accounting policy disclosure, AAP was required under GAAP to develop reliable accounting estimates for vendor incentives and assess on an ongoing basis whether the underlying assumptions behind the estimates had changed. However, as alleged herein, Defendants failed to comply with GAAP, which led to AAP significantly overstating its vendor incentives during the Class Period. This misstatement, in turn, caused AAP to significantly understate its reported cost of sales and SG&A expenses and overstate its reported operating income and margins during the Class Period. Importantly, Defendants have acknowledged that the restatement of AAP's vendor incentives was not the result of a change in estimate based on new information that became available in March 2024. Rather, the restatement, in accordance with ASC 250, indicates that the assumptions underlying AAP's reported vendor incentives during the Class period were not supported by the actual facts and circumstances that existed at the time the estimates were made.

## VII.    LOSS CAUSATION

107.    As detailed herein, Defendants made materially false and misleading statements and/or omitted material information concerning AAP's financial condition and prospects.

- 41 -

Defendants' misstatements and omissions were designed to and did artificially inflate, maintain, and manipulate the price of AAP common stock and deceived Lead Plaintiff and the Class, causing purchasers of AAP common stock to suffer economic harm as the truth reached the market. When the truth began to come out, it caused the price of AAP common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of AAP common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

108. On May 31, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports First Quarter 2023 Results." In the release, AAP announced that it was slashing FY23 guidance, which it had issued just three months prior, including by reducing net sales to $11.2-$11.3 billion, operating income margin to 5%-5.3%, and diluted EPS to $6-$6.50. The release also stated that for the 16 weeks ended April 22, 2023, its SG&A "included an out-of-period charge of approximately $17 million related to costs incurred in prior years but not expensed in the corresponding periods."

109. On this news, the price of AAP common stock plummeted by more than 39%, from a close of $112.20 on May 30, 2023 to a close of $68.03 on June 1, 2023.

110. On November 15, 2023, before the market opened, AAP issued a release entitled "Advance Auto Parts Reports Third Quarter 2023 Results and Provides Updates on Strategic and Operational Review." In the release, AAP announced disappointing results for 3Q23 and stated that it was again reducing its FY23 guidance, including by reducing operating income margin to 1.8%-2% and diluted EPS to $1.40-$1.80. The release also included a section entitled "Restatement of Previously Issued Financial Statements," which stated: "In connection with the preparation of the financial statements for the third quarter of 2023, the company identified

4869-4475-4872.v1

additional errors impacting cost of sales and selling, general and administrative costs." As a result of these so-called "errors," the Company disclosed that AAP's prior financial results had been overstated, including that AAP's originally reported operating income and operating margin in 4Q22 were overstated by nearly 11%. For FY22, AAP understated its cost of sales and SG&A expenses by $44 million, which caused reported operating income and operating margin to be overstated by 6.5%.

111.    On this news, the price of AAP common stock declined by almost 5%, from a close of $58.40 on November 14, 2023 to a close of $55.67 on November 15, 2023.

112.    On November 17, 2023, AAP filed a Form NT 10-Q with the SEC. In the Form NT 10-Q, AAP stated that it was "unable to complete the filing of its Quarterly Report on Form 10-Q for the quarter ended October 7, 2023 (the 'Form 10-Q') within the prescribed time frame without unreasonable effort or expense" because it had "identified certain accounting errors impacting cost of sales and selling, general and administrative costs occurring in fiscal year 2022." AAP went on to say that it had "determined that the Company's consolidated financial statements for the affected periods should be revised. The Company accordingly needs additional time to finalize the revisions to its financial statements for prior periods that will be reported in the Form 10-Q and to complete its procedures for finalizing the Form 10-Q."

113.    On this news, the price of AAP common stock declined by almost 6%, from opening at $54.00 to closing at $50.33 on November 17, 2023.

114.    On November 21, 2023, AAP filed its Form 10-Q with the SEC. The Form 10-Q further described and quantified AAP's restatement, stating that, while the Company had previously "identified an out of period charge of $17.3 million, which related to Selling, general and administrative ('SG&A') expenses incurred in prior years but not previously expensed and

was corrected by recognizing the charge in the sixteen weeks ended April 22, 2023," new management had now "identified additional errors impacting Cost of sales. These errors reduced Cost of sales in periods prior to fiscal year 2023 by $10.2 million and primarily related to product returns and vendor credits."

115.    On this news, the price of AAP common stock declined by almost 4%, from a close of $53.02 on November 20, 2023 to a close of $50.99 on November 21, 2023.

116.    Cumulatively, between November 14, 2023 and November 21, 2023 AAP's common stock declined almost 13%, from a close of $58.40 on November 14, 2023 to a close of $50.99 on November 21, 2023, as news regarding AAP's poor financial performance and restatement became known to the market.

117.    AAP's November 2023 disclosures did not fully quantify the size and scope of AAP's restatement. Indeed, Iskander expressly stated during the November 15, 2023 3Q23 conference call that further restatements were possible. Nevertheless, the die was cast, and market analysts correctly recognized that "we suspect we haven't seen the last restatements from Advance." ¶72.

118.    The decline in the price of AAP common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of Defendants' misrepresentations and omissions to investors and the market. The timing and magnitude of the price declines in AAP common stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' misstatements and omissions and the

- 44 -

subsequent significant decline in the value of AAP common stock when Defendants' misrepresentations and other fraudulent conduct were revealed.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

119.    In addition to the facts alleged above, numerous additional facts create a strong inference that Defendants acted knowingly with scienter when making their false and misleading statements and omissions during the Class Period.

### A.    Defendants' Fraud Enabled Greco and Shepherd to Receive Excess Incentive Compensation Payouts and Lucrative Raises

120.    Greco and Shepherd were highly motivated to commit the fraud alleged herein due to the fact that it enabled them to: (a) receive additional short-term incentive ("STI") payouts to which they were not entitled but for AAP's inflated reported financial performance; and (b) solicit shareholder approval for compensation raises that were approved just days before the fraud began to be revealed.

121.    First, during the Class Period, Greco's and Shepherd's compensation included a salary, as well as variable STI payouts that "deliver[ed] cash incentives when executives m[et] or exceed[ed] key financial and operating targets." During FY22, Greco's targeted STI compensation was $1.875 million, which was 50% higher than his salary. Shepherd's targeted STI compensation was $647,000, which was nearly the same as his salary. During FY22, Greco's and Shepherd's STI payouts were tied to meeting three criteria, including their ability to meet and exceed a threshold target for adjusted operating income of $1.017 billion. AAP reported adjusted operating income of $1.093 million in FY22, resulting in a 71% STI payout for that criteria. Overall, Greco

4869-4475-4872.v1

received a $750,000 STI payout and Shepherd received a $249,000 STI payout for FY22, which was primarily the result of hitting the threshold target for adjusted operating income.[4]

122.    As alleged herein, Defendants' falsified accounting inflated AAP's operating profit in FY22 and thus had significant impact on Greco's and Shepherd's STI payouts for FY22. For example, as part of its restatement, AAP acknowledged that its original FY22 reported operating income was overstated by $43.9 million. After adjusting for these accounting errors, Greco's and Shepherd's FY22 STI payout based on meeting and exceeding a threshold target for adjusted operating income was overstated by over 40% (71% STI payout for operating income criteria versus actual earned payout of 50%).

123.    Notably, in August 2023, AAP's Board enacted a Compensation Recovery Policy, which stated:

> [I]n the event the Company is required to prepare an accounting restatement, the Company will seek to recover reasonably promptly the amount of incentive compensation received by the Company's executive officers that exceeds the amount of incentive compensation that would have been received by the executive officers taking into account the effects of the accounting restatement. Pursuant to NYSE rules, the Compensation Recovery Policy applies to any compensation received by the Company's executive officers on or after October 2, 2023.

124.    AAP acknowledged that the Company's correction of accounting errors in March 2024 "qualified as a restatement under the Compensation Recovery Policy." In other words, had this policy been in place in FY22, Greco and Shepherd would have had to return to the Company a portion of their FY22 STI payouts, which had been achieved, in part, through improper accounting.

---

[4]    The other STI criteria in FY22 were comparable store sales, in which Greco and Shepherd only achieved a 45% payout, and free cash flow, in which Greco and Shepherd did not hit the threshold target and achieved a 0% payout.

4869-4475-4872.v1

125. In addition to STI payouts, Greco's and Shepherd's long-term incentive ("LTI") equity compensation was heavily dependent on AAP's stock price. During FY22, 50% of Greco's and Shepherd's LTI compensation was based on comparing AAP's shareholder return (*i.e.*, stock performance) against the other companies in the S&P 500. During FY22, Greco's targeted LTI compensation was $6.5 million, more than four times his salary. Shepherd's targeted LTI compensation was $1.6 million, more than double his salary. Thus, Greco and Shepherd were highly motivated to report improved financial results, which had a direct effect on AAP's stock price.

126. Second, on April 7, 2023, AAP circulated a proxy to shareholders scheduling a May 24, 2023 annual general meeting ("AGM") of shareholders at which, among other things: (a) shareholders would be asked to reelect Greco to the Board; (b) ratify the FY22 compensation paid to Greco and Shepherd; (c) approve a new 2023 Omnibus Incentive Compensation Plan, pursuant to which another 2.75 million shares of the Company's common stock would be made available to distribute to executives and employees; and (d) approve a new 2023 Employee Stock Purchase Plan, pursuant to which 2.5 million shares of the Company's common stock will be reserved for sale to executives and employees.

127. For FY22, that included raising Greco's $1.1 million salary by 13.6% to $1.25 million, citing: (a) his "[s]trong multi-year performance, including development and execution of a new strategic plan that resulted in record results in 2021"; (b) his "[m]aturity in role, including that Mr. Greco's salary had not been adjusted since joining the Company in 2016"; and (c) citing additional "[c]ompetitiveness and retention" factors needing to be considered – for a CEO who had already pledged to retire at the end of that year – purportedly in order to keep "Greco's base salary . . . within 10% of the median base salary among [the Company's] peer

4869-4475-4872.v1

group." Greco was also rewarded with $4.875 million in stock awards, $1.625 million in stock option awards, and $749,756 in cash incentive plan compensation, resulting in a total compensation package of $8.4 million. Likewise, Shepherd's salary would be raised 5.1% from $725,000 to $762,000 per year, citing "[p]erformance [that] exceeded individual objectives for 2021" and "market competitiveness." Shepherd was also rewarded with $1.2 million in stock awards, $400,154 in stock option awards, and $248,911 in cash incentive plan compensation, resulting in a total compensation package of more than $2.6 million. Shareholders were also asked to vote on a stockholder proposal "requiring an independent Board Chair," the only proposal against which the Board recommended shareholders vote.

128. As announced on May 31, 2023, the 2023 AGM was a success for Defendants and the AAP Board. Each of the proposals for which the Board sought shareholder approval passed handily, and "[a] majority of the Company's outstanding shares were cast against the vote to approve the stockholder proposal regarding requiring an independent Chair of the Board."

129. Only one week after Greco and Shepherd had secured from shareholders an increase in their compensation, the Company announced that it had missed its earnings expectations, was slashing the guidance it had announced only months earlier, and was reducing quarterly dividends.

## B. Numerous Executives Resigned or Separated from the Company Under Suspicious Circumstances

130. As AAP's transformation plan unraveled and it became apparent that the Company had misstated its financial results, numerous executives left the Company under unusual and suspicious circumstances. In only nine months, four of AAP's most senior executives – Greco, Shepherd, Pellicciotti, and Slone – left the Company. These departures further support a strong inference of scienter.

- 48 -

131.    On February 28, 2023, AAP announced that Greco would retire from his position "***at the end of the year***."  Though AAP was over two years into a three-year strategic plan spearheaded by Greco to transform the Company, as Greco knew or recklessly disregarded, the plan had failed.  But though Greco recognized during the conference call with analysts that AAP's "overall results did not meet expectations," he nevertheless told investors: "[W]e're confident that we can continue to grow margins from here."

132.    And despite his retirement, Greco told analysts during the conference call that he intended to see out the completion of the three-year plan.  He claimed that it was the "right time to begin transitioning leadership" because it would allow him time to work with the Board to identify his successor and work with the successor on "the process of updating our next multiyear strategy."  In the meantime, Greco said he remained "committed to the execution of our '23 plan."

133.    Then, on May 31, 2023, AAP stunned the market when it announced that its operating margins were "'well below expectations,'" it would not meet the guidance announced just months earlier, and, as a result, the Company was reducing its quarterly dividend.  On the same day, Greco reported that Lee, the independent chair to AAP's Board, had "'assumed an expanded role as interim executive chair.'"  In that role, Lee would "'be providing additional operational oversight and support to our management team.'"

134.    In fact, after the Company reported that it had to delay the filing of its 1Q23 Form 10-Q due to "a deficiency in the Company's internal control over financial reporting as of April 22, 2023," and as it faced further disappointing results for 2Q23, the Company announced that Greco would leave the CEO role far earlier than previously stated.  AAP reported on August 23, 2023 that Greco's successor, Shane M. O'Kelly, would take over effective September 11, 2023, and Greco would resign from the Board on the same day.

- 49 -

135. In the same August 23, 2023, disclosure to investors, AAP announced – without prior warning – that Shepherd, the Company's Executive Vice President and CFO, who directly oversaw the Company's accounting for vendor allowances, had "separated" from the Company effective immediately. Never before in AAP's history as a publicly traded company had it reported that a senior executive "separated" from the Company effective the same day. His separation came in the same period, 3Q23, that the Company identified accounting errors impacting its reported cost of sales and SG&A expenses. Because of Shepherd's abrupt departure, no succession plan was in place.

136. Shortly thereafter, on September 26, 2023, Pellicciotti, AAP's Senior Vice President, Controller, and CAO, who had joined the Company just 20 months earlier to assume CAO responsibilities from Shepherd, also abruptly resigned. During his brief tenure at AAP, AAP had to delay the filing of its 1Q23 Form 10-Q because of a deficiency in internal controls, which the Company attributed to "the loss of certain accounting personnel and turnover of accounting positions." Under Pellicciotti's watch, AAP's financial results for 3Q22, 4Q22, FY22, and 1Q23 were materially misstated. Pellicciotti's resignation also came without any plan for a successor to take his place.

137. These three key senior executive departures, all in short order, came on the heels of AAP's December 14, 2022 announcement that Slone, the Company's Executive Vice President, Supply Chain since October 2018, would retire from the Company. In his role, Slone's duties included "building a supply chain strategy to optimize processes, increase customer satisfaction and building a high-performing team in order to achieve a successful transformation of the Company's supply chain operations and directing and controlling the Company's supply chain activities throughout multiple facilities." Slone's efforts were a critical piece of Greco's three-

4869-4475-4872.v1

year plan, and Greco considered his work on supply chain to be "one of the great unlocks in our company." Slone claimed, when Greco announced the three-year plan, that, with his supply chain initiatives: "[W]e can hold more inventory on the higher velocity SKUs, improving availability." By November 2022, though, Greco reported that the Company was still seeking a "larger opportunity" in "inventory availability." Greco further told analysts that "the majority of the underperformance in pro [was] driven by availability and inventory positioning." Less than a month later, Slone was gone.

        **C.**    **The Specific Circumstances of AAP's Restatement Supports Scienter**

      138.    ***The type of restatement (misuse of available facts)***. As described herein (¶¶55, 101-106), AAP's restatement is an admission that: (a) its financial statements originally issued during the Class Period were false and in violation of GAAP; and (b) the financial results reported during the Class Period were incorrect based on information available to Defendants at the time the results were originally reported. The restatement was not the result of a change in estimate and was not the result of "new information."

      139.    ***The duration over which the improper accounting was perpetrated***. AAP's restatement does not hinge on a good faith accounting mistake or oversight during a single quarter or even a single year. AAP was forced to restate its previously issued financial statements for FY21, FY22, and the 40 weeks ended October 7, 2023. The nature of the accounting errors at issue – overstating vendor incentives and understating cost of sales and SG&A expenses – would have been viewed by Defendants at each month end or, at a minimum, each quarter end as part of AAP's financial closing process.

      140.    ***The magnitude or size of the restatement***. AAP's restatement was the result of significant accounting errors totaling over $100 million. In 4Q22 alone, AAP was forced to restate

- 51 -

Case 5:23-cv-00563-D-BM    Document 57    Filed 04/22/24    Page 54 of 68

year plan, and Greco considered his work on supply chain to be "one of the great unlocks in our company." Slone claimed, when Greco announced the three-year plan, that, with his supply chain initiatives: "[W]e can hold more inventory on the higher velocity SKUs, improving availability." By November 2022, though, Greco reported that the Company was still seeking a "larger opportunity" in "inventory availability." Greco further told analysts that "the majority of the underperformance in pro [was] driven by availability and inventory positioning." Less than a month later, Slone was gone.

    **C.**    **The Specific Circumstances of AAP's Restatement Supports Scienter**

    138.    ***The type of restatement (misuse of available facts)***. As described herein (¶¶55, 101-106), AAP's restatement is an admission that: (a) its financial statements originally issued during the Class Period were false and in violation of GAAP; and (b) the financial results reported during the Class Period were incorrect based on information available to Defendants at the time the results were originally reported. The restatement was not the result of a change in estimate and was not the result of "new information."

    139.    ***The duration over which the improper accounting was perpetrated***. AAP's restatement does not hinge on a good faith accounting mistake or oversight during a single quarter or even a single year. AAP was forced to restate its previously issued financial statements for FY21, FY22, and the 40 weeks ended October 7, 2023. The nature of the accounting errors at issue – overstating vendor incentives and understating cost of sales and SG&A expenses – would have been viewed by Defendants at each month end or, at a minimum, each quarter end as part of AAP's financial closing process.

    140.    ***The magnitude or size of the restatement***. AAP's restatement was the result of significant accounting errors totaling over $100 million. In 4Q22 alone, AAP was forced to restate

4869-4475-4872.v1


Case 5:23-cv-00563-D-BM     Document 57     Filed 04/22/24     Page 54 of 68

its net profit income by $24 million. To put this amount in context, AAP's originally reported net profit of $106 million in 4Q22 was overstated by nearly 30% after taking into account the restatement adjustments. In numerous other quarters, as detailed herein, the restatement adjustments revealed that AAP's originally issued financial results contained overstatements of profits of at least 8%.

141. ***The restatement errors had the impact of overstating AAP's reported profit and margins***. AAP's restatement does not hinge on good faith accounting mistakes that resulted in errors affecting AAP's profits in both directions. Instead, the directional impact of the accounting errors at issue caused AAP to consistently understate its expenses and overstate its operating profit and margins each quarter.

142. ***The SEC views restatements as indicative of scienter***. Finally, the SEC has stated it often uses restatements to demonstrate that persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, to prove the falsity and materiality of the original financial statements, [and] to demonstrate that persons responsible for the original misstatements acted with scienter . . . .

**D.      The Closeness in Time Between AAP's Full Year Guidance and Its Reduction**

143. The closeness in time between AAP's May 31, 2023 disclosures and the false and misleading statements and omissions alleged herein supports a strong inference of scienter.

144. On February 28, 2023, a full two months into the first quarter of FY23, based on AAP's '"positive momentum,"' the Company announced its FY23 financial guidance, asserting that several of the Company's key metrics would grow, including operating income margin, which it said would be between 7.8% and 8.2% in FY23. Discussing the 4Q23 earnings on a conference

- 52 -

call with investors, Shepherd noted that the guidance was "highlighted by modest growth in both our net and comp sales and GAAP margin expansion." Greco stated that the FY23 guidance was "underpinned by continued industry strength with the drivers of demand remaining positive." Greco also noted "changes in the competitive landscape" had occurred "last fall" in the professional sales channel but said "we're *confident* that we can *continue to grow margins* from here."

145. In a dramatic reversal, on May 31, 2023, AAP issued the Company's 1Q23 financial results, slashing the FY23 guidance it had issued to investors just three months prior. The Company now reported that its operating income margin would be between 5.0% and 5.3%. Greco, who had previously assured the market when speaking midway through the quarter about his confidence that the Company could "continue to grow margins," now was quoted in the Company's press release disclosing that margins had not grown as AAP's "'operating margin rate of 2.6% in the quarter was well below expectations.'" He further explained: "'We expect the competitive dynamics we faced in the first quarter to continue, resulting in a shortfall to our 2023 expectations.'"

146. Defendants' about-face in far less than one quarter supports a strong inference that Defendants knew that the Company's guidance had no reasonable basis. Particularly in light of the long-term nature of AAP's increasingly negative trends, the closeness in time between AAP's false and misleading statements and omissions and the revelation of the relevant truth supports a strong inference of scienter.

### E.  The Lack of Internal Controls in AAP's Accounting Department

147. Defendants admitted that their internal controls over financial reporting were deficient. This not only resulted in Defendants materially misstating their financial results but also

4869-4475-4872.v1

resulted in Defendants providing guidance for which they had no reasonable basis. These issues were considered to be a sign that accounting issues were "pervasive" and, notably, the material weakness in internal controls persisted beyond the Class Period.

148. Specifically, on June 2, 2023, AAP filed a Form NT 10-Q with the SEC, stating that it was "unable to complete the filing of its Quarterly Report on Form 10-Q for the quarter ended April 22, 2023 (the 'Form 10-Q') within the prescribed time frame without unreasonable effort or expense." AAP went on to explain:

> In the course of completing the preparation of the quarterly financial statements for the Form 10-Q, the Company determined that it had a deficiency in the Company's internal control over financial reporting as of April 22, 2023. Specifically, during the first quarter of fiscal 2023, the Company experienced the loss of certain accounting personnel and turnover of accounting positions, which may have resulted in a deficiency that represented a material weakness in the Company's internal control over financial reporting as of April 22, 2023.

149. Securities analysts who covered AAP were shocked by the Company's disclosures. BNP Paribas, in a June 2, 2023 analyst report entitled "10-Q extension raises five concerns," noted in part: "AAP is an ~$4.0B organization with ~40,000 full-time and ~27,000 part-time employees at year end of which 5% were employed at corporate. *We can't recall ever seeing this before for a similarly sized company* . . . ." The report further noted: "In Q1 the company booked a $17m charge due to certain amounts that were paid out in 2021/2022 but not correctly expensed in those years – *this is quite unusual and may have triggered additional audit due diligence*," and "this could cause increased scrutiny from auditors in order to remediate." Wells Fargo, in a June 2, 2023 analyst report entitled "AAP: Internal Control Issue the Next Shoe to Drop; Lowering PT Again," wrote the "hits keep coming for AAP after disclosing a potentially material internal control weakness and 10Q filing delay. Needless to say, *the wheels appear to be coming off* post-very weak Q1 results" and stated "[i]n our experience, *accounting issues can be pervasive*."

4869-4475-4872.v1

150.     On August 23, 2023, AAP filed its 2Q23 Form 10-Q with the SEC.   In the Form 10-Q, the Company stated that its disclosure controls and procedures were ***still*** "not effective to accomplish their objectives at the reasonable assurance level" because of the Company's continued inability to "attract, develop and retain sufficient resources to fulfill internal control responsibilities during the first quarter."

151.     On November 17, 2023, AAP filed a Form NT 10-Q, stating that, for the second time in FY23, the Company was "unable to complete the filing of its Quarterly Report on Form 10-Q for the quarter ended October 7, 2023 (the 'Form 10-Q') within the prescribed time frame without unreasonable effort or expense."   According to AAP:

> In the course of completing the preparation of its quarterly financial statements for the Form 10-Q, the Company identified certain accounting errors impacting cost of sales and selling, general and administrative costs occurring in fiscal year 2022. . . .   The Company accordingly needs additional time to finalize the revisions to its financial statements for prior periods that will be reported in the Form 10-Q and to complete its procedures for finalizing the Form 10-Q.

152.     On February 28, 2024, AAP filed a Form 12b-25, stating the Company was "unable to complete the filing of its Annual Report on Form 10-K for the fiscal year ended December 30, 2023 (the 'Form 10-K'), within the prescribed time frame without unreasonable effort or expense." According to AAP:

> The Company needs additional time to finalize its assessment of its internal control over financial reporting and related disclosures and to complete its procedures for finalizing the Form 10-K.   The Company expects to file the Form 10-K prior to the expiration of the extension period.

> As previously disclosed, management identified a material weakness in its internal control over financial reporting that existed due to turnover of key accounting positions during the first quarter of 2023.   The Company was unable to attract, develop and retain sufficient resources to fulfill internal control responsibilities during the first quarter.   ***Although that material weakness continued to exist at December 30, 2023***, the Company has devoted, and will continue to devote, significant time and resources to remediate the material weakness and enable the Company to conclude full remediation once the remedial

4869-4475-4872.v1

actions have been completed and have operated effectively for a sufficient period of time.

> As previously disclosed, the Company has completed **substantial remediation actions**, including hiring experienced personnel, including a new Chief Financial Officer (CFO) who began employment with the Company on November 27, 2023, and a new Chief Accounting Officer (CAO) who began employment with the Company on January 9, 2024.

153.     The Form 12b-25 further disclosed: "In the course of completing the preparation of its annual financial statements for the Form 10-K with the additional personnel and under the leadership of the new CFO and CAO, the Company identified certain accounting errors impacting cost of sales and selling, general and administrative costs occurring in fiscal years 2022 and 2021." As a result, "the Company, in consultation with the Company's Audit Committee, management and external auditors, determined that the Company's consolidated financial statements for 2022 and 2021 should be revised."

154.     On March 12, 2024, AAP filed its delayed 2023 Form 10-K with the SEC.  In the 2023 Form 10-K, AAP confirmed that the material weakness in the Company's internal control over financial reporting had continued to exist as of December 30, 2023:

> As previously disclosed in our Form 10-Q for the period ended April 22, 2023 and continuing to exist as of December 30, 2023, management identified a material weakness in our internal control over financial reporting that existed due to turnover of key accounting positions.  The Company was not able to attract, develop and retain sufficient resources to fulfill internal control and accounting responsibilities.

155.     The Company further disclosed the efforts it was taking to remediate the material weakness, including hiring a new CFO, CAO, and "approximately 30 experienced personnel" and noted that it had been required to devote, "and will continue to devote, significant time and resources to complete its remediation of the material weakness."  The Company further indicated that the material weakness was still not remediated and would "not be considered fully remediated

4869-4475-4872.v1

until the remediation actions are tested and deemed to have been operating effectively for a sufficient period of time."

## IX. NO SAFE HARBOR

156.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Certain of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, including because the circumstances about which such cautionary language warned had in fact already occurred.

157.     To the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of AAP who knew that the statement was false when made.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

158.     At all relevant times, the market for AAP common stock was an efficient market for the following reasons, among others:

(a)     AAP common stock met the requirements for listing, was listed, and was actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, AAP filed periodic public reports with the SEC and the NYSE;

- 57 -

(c)     AAP regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     AAP was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, and each of these reports was publicly available and entered the public marketplace; and

(e)     AAP's stock price reacted in response to new, material information about AAP's business.

159.     As a result of the foregoing, the market for AAP common stock promptly digested current information regarding AAP from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of AAP common stock during the Class Period suffered similar injury through their purchase of AAP common stock at artificially inflated prices, and a presumption of reliance applies.

160.     Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.     CLASS ACTION ALLEGATIONS

161.     Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired AAP common stock during the Class Period (the "Class"). Excluded from

- 58 -

the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

162. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AAP shares were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by AAP, its transfer agent, or securities brokers and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

163. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

164. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of AAP;

4869-4475-4872.v1

(c)     whether the price of AAP common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

166.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

167.     Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

168.     This count is brought by Lead Plaintiff on behalf of itself and the Class.

169.     This count is brought against all Defendants.

170.     During the Class Period, each of the Defendants named in this count disseminated or approved the statements as specified above in ¶¶78-100, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171.     Defendants named in this count violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

- 60 -

4869-4475-4872.v1

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AAP common stock during the Class Period.

172.    Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about AAP's business, operations, and financial condition as specified herein.

173.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the truth that was available to them.

174.    As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of AAP common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased or otherwise acquired AAP common stock during the Class Period at artificially high prices and were damaged thereby.

175.    Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for AAP common stock and suffered losses when the relevant truth was

4869-4475-4872.v1

revealed. Lead Plaintiff and the Class would not have purchased AAP common stock at the prices they paid, or at all, if they had been aware the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

176. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in AAP common stock.

177. By reason of the foregoing, Defendants named in this count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against All Defendants)

178. Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

179. This count is brought by Lead Plaintiff on behalf of itself and the Class.

180. This count is brought against all Defendants.

181. Each of the Defendants named in this count acted as a controlling person within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of AAP, their ownership and contractual rights, participation in, and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the allegedly false and misleading statements.

182. In particular, each of these Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to

- 62 -

control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I and exercised that power.

183.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period when the relevant truth was revealed.

184.    By reason of the foregoing, Defendants named in this count violated §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.    Determining this action is a proper class action by certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding injunctive and such other equitable relief as the Court may deem just and proper.

4869-4475-4872.v1

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: April 22, 2024

s/ Christopher M. Wood

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
HENRY S. BATOR
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
hbator@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ASHLEY M. PRICE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff

HIGGINS BENJAMIN, PLLC
ROBERT N. HUNTER, JR.
301 N. Elm St., Suite 800
Greensboro, NC 27401
Telephone: 336/275-7577
rnhunterjr@greensborolaw.com
State Bar No. 5679

Local Counsel and Local Civil Rule 83.1(d)
Attorney for Lead Plaintiff

- 64 -

4869-4475-4872.v1

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

4869-4475-4872.v1