IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-563-D

MIGUEL SUAREZ, Individually and on )
Behalf of All Others Similarly Situated )
 )
Plaintiff, )
 )                    **ORDER**
v. )
 )
ADVANCE AUTO PARTS, INC. et. al., )
 )
Defendants.

On October 9, 2023, Miguel Suarez ("Suarez") filed a federal securities class action complaint against Advance Auto Parts, Inc. ("Advance"), Thomas R. Greco ("Greco"), and Jeffrey W. Shepherd ("Shepherd") (collectively "defendants") [D.E. 1]. On February 2, 2024, the court appointed the City of Southfield General Employees' Retirement System ("Southfield" or "plaintiff") as lead plaintiff [D.E. 48]. On April 22, 2024, Southfield filed a consolidated complaint ("complaint") [D.E. 57].

On June 21, 2024, defendants filed a motion to dismiss [D.E. 59], and a memorandum [D.E. 60] and exhibits [D.E. 60] in support. See Fed. R. Civ. P. 12(b)(6). On August 13, 2024, Southfield responded in opposition [D.E. 62] and filed exhibits in support [D.E. 63]. On September 13, 2024, defendants replied [D.E. 64] and filed exhibits in support [D.E. 65]. As explained below, the court grants defendants' motion to dismiss the complaint.

I.

Southfield is a public pension fund based in Southfield, Michigan "with assets over $115 million for the benefit of hundreds of participants." Compl. [D.E. 57] ¶ 18. Southfield purchased

Case 5:23-cv-00563-D-BM   Document 66   Filed 01/23/25   Page 1 of 15

shares of Advance common stock "at artificially inflated prices during the Class Period and was damaged thereby." Id. Southfield defines the class period as "between November 15, 2022, and November 20, 2023," (the "class period"). Id. at ¶ 1. At its core, Southfield alleges: (1) defendants knowingly or recklessly misrepresented Advance's financial results and forecasts both before and during the class period; and (2) defendants' disclosed accounting errors and internal structure support finding scienter.

As for Southfield's forecast and result allegations, Southfield contends Advance "undertook a broad-based turnaround effort designed to improve the efficiency of its operation and rehabilitate chronically low margins." Compl. ¶ 3; see id. at ¶¶ 34–44. Shepherd and Greco spearheaded this initiative and endorsed its efficacy in public statements. See id. at ¶¶ 32–42. "[B]ouyed by positive momentum from strong results for the fourth quarter of 2022 [("4Q22")], [d]efendants issued better-than-expected full year 2023 [("FY23")] guidance, including $11.2 billion–$11.6 billion in net sales, 1%–3% in comparable sales growth, 7.8%–8.2% in operating income margin, and $10.20–$11.20 in diluted earnings per share." Id. at ¶ 4. Southfield alleges defendants overstated Advance's 4Q22 and full year 2022 ("FY22") financial results by "improperly accounting for vendor incentives." Id. at ¶ 5. Southfield alleges these misrepresentations mislead investors and concealed that Advance's "so-called transformation initiatives had not positioned [Advance] to achieve its stated FY23 financial guidance." Id. at ¶ 44.

Southfield also alleges defendants' public assurances regarding the FY23 forecast were false. See id. at ¶¶ 62–77. On February 28, 2023, defendants issued Advance's FY23 financial guidance, in which Shepherd stated, "we are elevating our performance to improve topline growth and share gains while delivering operating income margin expansion." Id. at ¶ 62. That same day,

2

Greco stated "we're confident that we can continue to grow margins from here." Id. Southfield alleges Advance's FY23 guidance called for operating margins "between 7.8% and 8.2%" and operating income "between $889 million and $951 million, a significant increase over Advance's $714 million of operating income in FY22." Id.

Southfield alleges Advance "purchased merchandise from over 1,400 vendors." Id. at ¶ 45. Despite defendants' public assurances, Southfield alleges defendants improperly accounted for these vendor transactions, leading to overstated "financial results during and prior to the class period." Id. at ¶ 47. Southfield alleges defendants began issuing public statements to correct their overstated 2023 forecasts. On May 31, 2023, Advance issued a release stating that for the 16 weeks ended April 22, 2023, Advance's selling, general, and administrative expenses "included an out-of-period charge of approximately $17 million related to costs incurred but not expensed in the corresponding periods." Id. at ¶ 50. After this announcement, Southfield alleges Advance's "common stock plummeted by more than 39%, from a close of $112.20 on May 30, 2023 to a close of $68.03 on June 1, 2023." Id. at ¶ 10.

On November 15, 2023, Advance issued a release stating "[i]n connection with the preparation of the financial statements for the third quarter of 2023 [(3Q23)], [Advance] identified additional errors impacting cost of sales and selling, general, and administrative costs." Id. at ¶ 51. This statement included a restatement of Advance's previously issued financial statements. See id. Following this announcement, Southfield alleges Advance's "common stock declined by almost 5%, from a close of $58.40 on November 14, 2023 to a close of $55.67 on November 15, 2023." Id. at ¶ 11. On November 17, 2023, Advance filed a form NT 10-Q with the SEC in which defendants stated that had "identified certain accounting errors impacting cost of sales and selling, general and administrative costs occurring in fiscal year 2022." Id. at ¶ 12. Following this

3

disclosure, Southfield alleges Advance "common stock declined by almost 6%, from opening at $54.00 to closing at $50.33 on November 17, 2023." Id. On November 21, 2023, Advance filed "its form 10-Q for the [3Q23] with the SEC" and disclosed that "errors reduced Cost of sales . . . by $10.2 million and primarily related to product returns and vendor credits." Id. at ¶ 13. After this disclosure, Southfield alleges Advance's "common stock declined by almost 4% from a close of $53.02 on November 20, 2023 to a close of $50.99 on November 21, 2023." Id.

On August 23, 2023, defendants issued a release in which they again decreased Advance's FY23 guidance. See id. at ¶ 68. On November 21, 2023, Advance filed its form 10-Q for the second quarter of 2023 with the SEC and disclosed "additional errors impacting the Cost of sale. These errors reduced the Cost of sales in period prior to fiscal year 2023 by $10.2 million and primarily related to product returns and vendor credits." Id. at ¶ 52. On March 12, 2024, in Advance's 10-K filing with the SEC for FY23, defendants admitted to accounting errors of over $100 million in full year 2021 ("FY21"). See id. at ¶ 53. Southfield alleges these accounting errors "caused [Advance] to significantly understate its reported expenses and overstate its operating profit during the class periods." Id.

Southfield alleges Advance's "financial results included in its 3Q22 earnings release and 3Q22 Form 10-Q were materially overstated . . . by 5.7%." Id. at ¶ 80(a). As for the 4Q22 and FY22 financial results, Southfield alleges Advance's "operating income for the 12 weeks and 52 weeks ended December 31, 2022, was overstated by 10.6% and 6.5%, respectively." Id. at ¶ 85(a). Moreover, Southfield alleges Advance's: "[(1)] operating margin for the same time periods was overstated by 10.6% and 6.5%"; "[(2)] net income for the same time periods was overstated by 28.7% and 8.1%"; and "[(3)] [earnings per share] for the same time periods was overstated by 28.8% and 8.1%." Id. Southfield alleges Advance's "1Q23 operating income and operating

4

margin . . . were overstated by 8.9%." Id. at ¶ 89(a). Southfield alleges Advance's "2Q23 operating income and operating margin were overstated by 6.7%, its net income was overstated by 8.6%, and its [earnings per share] was overstated by 8.3%." Id. at ¶ 93(a). Southfield alleges defendants' accounting errors and misstated results violated generally accepted accounting principles ("GAAP") and that these GAAP violations were material. See id. at ¶¶ 101–04.

As for scienter, Southfield alleges that Greco and Shepherd were "highly motivated to commit the fraud alleged . . . due to the fact that it enabled them to: (a) receive additional short-term incentive ('STI') payouts . . . and (b) solicit shareholder approval for compensation rates that were approved just days before the fraud began to be revealed." Id. at ¶ 120; see id. ¶¶ 120–29. Moreover, Southfield alleges a reasonable person may infer scienter from the departure of four senior executives from Advance in a nine-month period. See id. ¶¶ 130–37. Furthermore, Southfield alleges Advance's restatement supports inferring scienter. See id. at ¶¶ 138–42. Southfield also alleges "the closeness in time between [Advance's] May 31, 2023 disclosures and the false and misleading statements and omissions alleged herein supports a strong inference of scienter." Id. at ¶ 142; see id. at ¶¶ 142–46. Finally, Southfield alleges defendants' lack of internal controls over financial reporting support inferring scienter. See id. at ¶¶ 147–55.

Defendants move to dismiss Southfield's complaint "pursuant to the Reform Act and Federal Rules of Civil Procedure 9(b) and 12(b)(6)." [D.E. 60] 36. Defendants argue the court "should dismiss [Southfield's] Forecast allegations because: (i) [Advance's] 2023 Guidance is forward-looking and protected by the Reform Act's safe harbor; (ii) the statements that Defendants made around the 2023 Guidance are also protected by the safe harbor or amount to inactionable corporate puffery (or both); and (iii) Southfield does not plead particularized facts giving rise to any inference, let alone the require strong inference, of scienter." [D.E. 60] 18–19. Defendants

5

also argue the court "should dismiss [Southfield's] Accounting allegations because (a) the accounting errors were not material, and (b) the Complaint does not plead particularized facts giving rise to a strong inference that Defendants acted with scienter." Id. at 19.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

6

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

To survive a Rule 12(b)(6) motion to dismiss a fraud claim, a plaintiff generally must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When alleging a violation of section 10(b) or Rule 10b-5, the pleading standard for certain elements is even higher. See Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, § 101(b), 109 Stat. 737, 743–49 (codified at 15 U.S.C. § 78u-4); 15 U.S.C. § 78u-4(b); Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 277 (2014); Chadbourne & Parke LLP v. Troice, 571 U.S. 377, 383 (2014); Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 460–61 (2013); Tellabs, 551 U.S. at 313–14; San Antonio Fire & Police Pension Fund v. Syneos Health Inc., 75 F.4th 232, 240 (4th Cir. 2023); Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc., 61 F.4th 369, 381–82 (4th Cir. 2023); KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th 601, 607 (4th Cir. 2021); In re Triangle Cap. Corp. Sec.

7

Litig., 988 F.3d 743, 751 (4th Cir. 2021); Singer v. Reali, 883 F.3d 425, 439 (4th Cir. 2018); Maguire Fin., LP v. PowerSecure Int'l, Inc., 876 F.3d 541, 546–47 (4th Cir. 2017); Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606 (4th Cir. 2015); Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 885 (4th Cir. 2014); Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 471 n.5 (4th Cir. 2011); Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181–82 (4th Cir. 2009); Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 173–74 (4th Cir. 2007); Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 344 n.4 (4th Cir. 2003).

> The 1934 Act's section 10(b) prohibits
>
> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). One such rule is Rule 10b-5. See 17 C.F.R. § 240.10b-5. In relevant part, Rule 10b-5 prohibits

> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Id. To establish section 10(b) and Rule 10b-5 liability, Southfield must plausibly allege six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; (6) and loss causation." Halliburton, 573 U.S. at 267; Amgen, 568 U.S. at 460–61; Matrixx Initiatives, Inc. v. Siracusano,

8

563 U.S. 27, 37–38 (2011); Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005); MacroGenics, 61 F.4th at 382; KBC Asset Mgmt. NV, 19 F.4th at 607; In re Triangle Cap., 988 F.3d at 750 n.4; Singer, 883 F.3d 438; Maguire, 876 F.3d at 546; Zak, 789 F.3d at 605; Yates, 744 F.3d at 884; Katyle, 637 F.3d at 466 n.1; Matrix Cap. Mgmt. Fund, 576 F.3d at 181; Hunter, 477 F.3d 172 & n.2; Ottmann, 353 F.3d at 342; Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec, No. 5:11-CV-4, 2013 WL 1192004, at *7 (E.D.N.C. Mar. 22, 2013) (unpublished).

As for the first element, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." PSLRA § 101(b); see 15 U.S.C. § 78u-4(b)(1); Matrixx Initiatives, 563 U.S. at 38 n.4; Hunter, 477 F.3d at 172. Moreover, the allegedly false or misleading statement or omission must be material. See Matrixx Initiatives, 563 U.S. at 38. To be material, there must be a "substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." MacroGenics, 61 F.4th at 382 (quotation omitted); SEC v. Pirate Inv'r LLC, 580 F.3d 233, 240 (4th Cir. 2009) (per curiam). Section 10(b) and Rule 10b-5 "decidedly do not prohibit any misrepresentation—no matter how willful, objectionable, or flatly false—of immaterial facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material." MacroGenics, 61 F.4th at 382 (cleaned up); Greenhouse v. MCG Cap. Corp., 392 F.3d 650, 656 (4th Cir. 2004). "Ultimately, the inquiry is whether, read as a whole, the statements or omissions would have misled a reasonable investor about the nature of the securities." MacroGenics, 61 F.4th at 382–83 (cleaned up).

9

As for the second element, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. PSLRA § 101(b); see 15 U.S.C. § 78u-4(b)(2)(A); Tellabs, 551 U.S. at 313–14; Syneos Health, 75 F.4th at 240–41; Hunter, 477 F.3d at 172. Put differently "plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with intentional or reckless deception with respect to each act or omission alleged." Syneos Health, 75 F.4th at 241 (cleaned up). A "strong" inference is one that is "more than merely plausible or reasonable—it [is] cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see Matrixx Initiatives, 563 U.S. at 48–49. A court cannot evaluate the "strength of an inference . . . in a vacuum." Tellabs, 551 U.S. at 323–24. Rather, at the motion to dismiss stage, the court must consider "plausible, nonculpable explanations for the defendant's conduct." Id. at 324.

"Applying this heightened pleading standard is a comparative, two-step process." Syneos Health, 75 F.4th at 241; see Tellabs, 551 U.S. at 314. The court first considers the "inferences [of scienter] urged by the plaintiff." Syneos Health, 75 F.4th at 241; Tellabs, 551 U.S. at 314. The court "collectively" analyzes the facts allegedly creating a strong inference of scienter and does not scrutinize the allegations "in isolation." Tellabs, 551 U.S. at 323; cf. Matrix Cap. Mgmt. Fund, 576 F.3d at 183 (viewing scienter allegations "holistically"). The court then weighs those inferences "against competing inference rationally drawn from the facts alleged, giving each only the inferential weight warranted by context and common sense." Syneos Health, 75 F.4th at 241 (cleaned up); see Matrix Cap. Mgmt. Fund, 576 F.3d at 183. The strong inference of scienter must be established against each individual defendant. Id. at 182.

In addition to intentional conduct, "[a]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." Zak, 780 F.3d at 606; see Matrix Cap. Mgmt.

10

Fund, 576 F.3d at 181; Matrixx Initiatives, 563 U.S. at 47 (assuming, without deciding, that recklessness suffices to establish scienter for section 10(b) actions). In a securities fraud claim, recklessness means conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Matrix Cap. Mgmt. Fund, 576 F.3d at 181 (quotation omitted); see Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008). After comparing the malicious and innocent inferences cognizable from the facts pled, a court should not dismiss a complaint where "the malicious inference is at least as compelling as any opposing innocent inference." Zak, 780 F.3d at 606 (quotation omitted). But a plaintiff does not cross the scienter threshold if the "more compelling" inference is that "defendants acted innocently, or even negligently." Pub. Emps.' Ret. Ass'n, 551 F.3d at 313.

Southfield plausibly alleges: (1) a connection between defendants' alleged misrepresentation or omission and the purchase or sale of a security; (2) plaintiff's reliance upon the misrepresentation or omission; (3) plaintiff's economic loss; (4) and loss causation. See Matrixx Initiatives, 563 U.S. at 37–38; Stoneridge Inv. Partners, 552 U.S. at 157; Broudo, 544 U.S. at 341–42; MacroGenics, 61 F.4th at 382; Matrix Cap. Mgmt. Fund, 576 F.3d at 181; Tekelec, 2013 WL 1192004 at *7. Defendants argue that Southfield fails to plausibly allege materiality and scienter.

As for materiality, Southfield alleges defendants' accounting errors "totaled over $100 million." [D.E. 62] 17; see Compl. ¶ 140. Southfield also alleges defendants repeatedly published overstated operating and income margins throughout the class period. See [D.E. 62] 17; Compl.

11

at ¶¶ 80–100. When defendants corrected these overstated values, Southfield cites repeated declines in Advance's common stock. See Compl. ¶¶ 10–11. Specifically, Southfield alleges defendants' public statements and corrections "contribute to [Advance's] stock price plunge of almost 40% on May 31, 2023." [D.E. 62] 18. Defendants dispute the materiality of their public statements and scienter. See [D.E.60] 18–23.

Accepting the complaint's factual allegations as true, Southfield's allegations suggest a substantial likelihood that a purchaser or seller: "(1) would consider defendants' overestimations as important in deciding whether to buy Advance common stock; and, (2) had the breadth of defendants' overstatements been known, would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." MacroGenics, 61 F.4th at 382 (quotation omitted); Pirate Inv'r LLC, 580 F.3d at 240. Thus, Southfield plausibly alleges defendants' public statements amount to material misrepresentations or omissions.

As for scienter, Southfield "must state with particularity facts giving rise to a strong inference that the defendant acted with intentional or reckless deception with respect to each act or omission alleged." Syneos Health, 75 F.4th at 241 (cleaned up). Although Southfield's complaint offers various grounds on which to infer scienter, shotgun pleading alone does not surmount the heightened pleading standard applied to fraud claims.

Southfield alleges that Greco and Shepherd were "highly motivated to commit the fraud alleged . . . due to the fact that it enabled them to: (a) receive additional short-term incentive ('STI') payouts . . . and (b) solicit shareholder approval for compensation rates that were approved just days before the fraud began to be revealed." Compl. ¶ 120; see id. ¶¶ 120–29. This allegation does not comport with Southfield's allegations that accounting errors within the company led to defendants' overstated public announcements. Southfield does not allege that defendants created

12

or concealed these accounting errors. In fact, defendants publicly corrected and disclosed these accounting errors after discovering them. See, e.g., id. at ¶ 11–13. Having considered Southfield's allegations, the court concludes that context and common sense suggest that defendants based their public announcements on internal accounting data that they later determined to be erroneous. See Syneos Health, 75 F.4th at 241 (cleaned up); see Matrix Cap. Mgmt. Fund, 576 F.3d at 183. Upon discovering the errors, defendants adjusted their public statements and issued a necessary restatement of financial results. "Pleading fraud by hindsight, or Monday morning quarterbacking of this sort, is insufficient pleading under the [PSLRA]." Tekelec, 2013 WL 1192004 at *13 (quoting Smith v. Cir. City Stores, Inc., 286 F. Supp. 2d 707, 715 (E.D. Va. 2003)); see Boykin v. K12, Inc., 54 F.4th 175, 185 (4th Cir. 2022); KBC Asset Mgmt. NV, 19 F.4th at 613; In re Triangle Cap., 988 F.3d at 753; Hunter, 477 F.3d at 183–84.

Second, Southfield seeks to infer scienter from the departure of four senior executives from Advance in a nine-month period. See Compl. ¶¶ 130–37. Southfield does not, however, allege facts sufficient to connect the executives' departure with defendants' alleged scienter. Southfield's speculation fails to overcome the heightened pleading standard applied to fraud claims.

Next, Southfield alleges Advance's restatement supports inferring scienter. See id. at ¶¶ 138–46. Specifically, Southfield alleges that the circumstances surrounding Advance's restatement support a strong inference of scienter. See id. at ¶¶ 138–140. Apart from naked speculation, Southfield does not allege facts sufficient to suggest that Advance's restatement amounts to anything more than a public disclosure of good faith errors committed during internal accounting processes at the company. The restatement corrected previously issued erroneous information and adjusted defendants' forecast accordingly. Southfield does not allege facts

13

sufficient to conclude that defendants concealed the information contained in the restatement or conspired to delay its release.

Southfield also alleges that "the closeness in time between [Advance's] May 31, 2023 disclosures and the false and misleading statements and omission alleged herein supports a strong inference of scienter." Id. at ¶ 143. Temporal proximity between public announcements and subsequent restatements, however, does not alone support a strong inference of scienter. See KBC Asset Mgmt. NV, 19 F.4th at 612.

Finally, Southfield alleges defendants' lack of internal controls over financial reporting support inferring scienter. See Compl. ¶¶ 147–55. To the contrary, defendants' restatement and public corrections suggest sufficient internal controls because the accounting errors were detected and disclosed. Southfield does not allege that defendants sold stock or otherwise profited or attempted to profit before the defendants publicly disclosed the internal accounting errors. Having considered Southfield's allegations, the court concludes that context and common sense suggest that defendants acted in good faith and corrected publicly available information each quarter. See Syneos Health, 75 F.4th at 241 (cleaned up); see Matrix Cap. Mgmt. Fund, 576 F.3d at 183.

Southfield's allegations fail to show that the defendants' actions were "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Matrix Cap. Mgmt. Fund, 576 F.3d at 181 (quotation omitted); see Pub. Emps.' Ret. Ass'n, 551 F.3d at 313; Cozzarelli, 549 F.3d at 623. The more compelling inference is that defendants acted in good faith throughout the class period. See Pub. Emps.' Ret. Ass'n, 551 F.3d at 313.

14

A holistic analysis of Southfield's allegations reveals, at most, defendants discovered accounting errors had influenced public estimates and forecasts and issued corrective public statements. Here, Southfield has failed to create a strong inference of scienter as to defendants.

III.

"Because the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation of [section] 10(b), it also fails with respect to the [section] 20(a) claims." Matrix Cap. Mgmt. Fund, 576 F.3d at 192; see In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561, 589 (D. Md. 2005). Accordingly, the court dismisses without prejudice Southfield's claim under section 20(a).

IV.

In sum, plaintiff's allegations fall within the heartland of securities fraud actions that the PSLRA intended to curtail. The allegedly false or misleading statements that plaintiff cites are not actionable. Plaintiff has failed to create the required strong inference of scienter against any individual defendant or Advance. A reasonable person would find the cogent, non-culpable explanations for defendants' conduct more compelling. Thus, the court GRANTS defendants' motion to dismiss plaintiff's complaint [D.E. 59] and DISMISSESS WITHOUT PREJUDICE the complaint.

SO ORDERED. This 23 day of January, 2025.

JAMES C. DEVER III
United States District Judge

15

Case 5:23-cv-00563-D-BM   Document 66   Filed 01/23/25   Page 15 of 15